Slip Op. 09-106

UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - -x
AMANDA FOODS (VIETNAM) LTD.,   :
et al.,                        :
                               :
                               :
            Plaintiffs,        :
                               :
                               :
            v.                 :    Before: Pogue, Judge
                               :    Consol. Ct. No. 08-00301
                               :
UNITED STATES, et al.,         :
                               :
            Defendants.        :
                               :
                               :
- - - - - - - - - - - - - - - -x
```

**OPINION AND ORDER**

[Remand to Department of Commerce for further consideration of
surrogate country selection and appropriate separate rates for
non-individually investigated respondents.]


Dated: September 29, 2009

Mayer Brown LLP (Matthew J. McConkey and Jeffery C. Lowe) for
Plaintiff Amanda Foods (Vietnam) Ltd.

Picard Kentz & Rowe LLP (Andrew W. Kentz and Nathaniel M.
Rickard) for Consolidated Plaintiff and Defendant-Intervenor Ad
Hoc Shrimp Trade Action Committee.

Thompson Hine LLP (Matthew R. Nicely and Christopher M. Rassi)
and Winston & Strawn LLP (Valerie S. Ellis and William H.
Barringer) for Consolidated Plaintiffs Ca Mau Seafood Joint Stock
Company; Cadovimex Seafood Import-Export and Processing Joint-
Stock Company; Cafatex Fishery Joint Stock Corporation; Can Tho
Agricultural and Animal Products Import Export Company; Coastal
Fisheries Development Corporation; C.P. Vietnam Livestock Co.,
Ltd.; Cuulong Seaproducts Company; Danang Seaproducts Import

Export Corporation; Investment Commerce Fisheries Corporation; Minh Hai Export Frozen Seafood Processing Joint-Stock Company; Minh Hai Joint-Stock Seafoods Processing Company; Ngoc Sinh Private Enterprise; Nha Trang Fisheries Joint Stock Company; Nha Trang Seaproduct Company; Phu Cuong Seafood Processing & Import-Export Co., Ltd.; Sao Ta Foods Joint Stock Company; Soc Trang Aquatic Products and General Import-Export Company; Thuan Phuoc Seafoods and Trading Corporation; UTXI Aquatic Products Processing Company; Viet Foods Co., Ltd.; Kim Anh Co., Ltd.; Phuong Nam Co., Ltd.

Tony West, Assitant Attorney General; Jeanne E. Davidson, Director; Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Stephen C. Tosini), and, of counsel, Jonathan Zielinski, Office of Chief Counsel for Import Administration, Department of Commerce for Defendant United States.

Thompson Hine LLP (Matthew R. Nicely and Christopher M. Rassi) for Defendant-Intervenors Camau Frozen Seafood Processing Import Export Corporation; Grobest & I-Mei Industrial (Vietnam) Co., Ltd.; Minh Phu Seafood Corporation; Minh Qui Seafood Co., Ltd.; Minh Phat Seafood Co., Ltd.

**Pogue, Judge**: In this consolidated action, Plaintiffs seek review of the Final Results issued by the Department of Commerce ("the Department" or "Commerce") in the second administrative review ("Second Review") of the antidumping ("AD") order covering warmwater shrimp from the Socialist Republic of Vietnam. See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam, 73 Fed. Reg. 52,273 (Dep't Commerce Sept. 9, 2008) (final results and final partial rescission of antidumping duty administrative review) ("Final Results"),[1] and accompanying Issues

---

[1] The Final Results cover entries of the subject merchandise made from February 1, 2006 through January 31, 2007, the period

& Decision Memorandum, A-552-802, 2d AR 02/01/06-01/31/07

(Sept. 2, 2008), Admin. R. Pub. Doc. 231, available at

http://ia.ita.doc.gov/frn/summary/vietnam/E8-20927-1.pdf (last

visited Sept. 23, 2009) ("Issues & Decision Mem.").[2]

Three questions are before the court.  First, whether

Commerce's selection of Bangladesh as the surrogate country[3] for

the Second Review was supported by substantial evidence on the

record[4]; second, whether Commere's decision to value raw shrimp

based on the surrogate value data contained in an

---

of review ("POR").

[2] The Issues & Decision Mem. was adopted by and incorporated
into the Final Results. Final Results, 73 Fed. Reg. at 52,273.

[3] Vietnam has a non-market economy ("NME"). Generally, in an
NME, because of limitations on the availability of data, Commerce
may not be able to determine the normal or fair market value of
products as it would in a market economy ("ME").  Consequently,
Commerce derives the normal value of such products by aggregating
the "best available" information with respect to factors utilized
to produce the merchandise in "a market economy country or
countries considered to be appropriate by [the Department],"
i.e., a "surrogate" country. Tariff Act of 1930 § 773(c)(1), as
amended, 19 U.S.C. § 1677b(c)(1).

[4] See Dorbest Ltd. v. United States, 30 CIT 1671, 1676
462 F. Supp. 2d 1262, 1268 (2006) ("If the question is whether
Commerce *may* use a particular piece of data, whether Commerce *may*
use a factor in weighing the choice between two data sources, or
what weight Commerce *may* attach to such a factor, the question is
legal.  . . .  If the question is whether Commerce *should* have
used a particular piece of data, when viewed among alternative
available data, or what weight Commerce *should* attach to a price
or data, the question is factual." (emphasis in original)
(citations omitted)).

intergovernmental agency study, Network of Aquaculture Centres in
Asia-Pacific, <u>Evaluation of the Impact of the Indian Ocean
Tsunami and the US Anti-Dumping Duties on the Shrimp Farming
Sector of South and South-East Asia: Case Studies in Vietnam,
Indonesia and Bangladesh</u> (2006),
http://library.enaca.org/shrimp/publications/NACAStudy.pdf ("NACA
Study"), is supported by substantial evidence on the record; and,
third, whether Commerce's assignment – as reasonable for
Plaintiffs –  of a separate or "all others" rate of either 4.30%
or 4.57% was supported by substantial evidence on the record.

After specifying the controlling standard of review and
summarizing the background of this dispute, the court will
discuss each issue in turn.

### Standard of Review

When it reviews the agency's final determinations in an
administrative review of an AD duty order, the court will uphold
all agency determinations, findings, or conclusions, except those
not supported by substantial evidence on the record or otherwise
not in accordance with law. Tariff Act of 1930
§ 516A(b)(1)(B)(i), as amended, 19 U.S.C.
§ 1516a(b)(1)(B)(i)(2006).[5]

---

[5] Further citation to the Tariff Act of 1930 is to Title 19
of the U.S. Code, 2006 edition.

In reviewing whether Commerce's decisions are unsupported by substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  While "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence," Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted), the "substantiality of evidence must [also] take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Gerald Metals, Inc. v United States, 132 F.3d 716, 720 (Fed. Cir. 1997) (explaining that the substantial evidence standard requires that contradictory record evidence be taken into account).

## Background

At the request of Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC") and twenty-two individual exporters, Commerce, in April 2007, initiated the Second Review. See Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam

and the People's Republic of China, 72 Fed. Reg. 17,095, 17,096

(Dep't Commerce Apr. 6, 2007) (notice of initiation of

administrative reviews of antidumping orders).

For this POR, eighteen of the twenty-three respondent

Plaintiffs now before us requested review, while representatives

of the domestic industry requested review for all twenty-three

respondent Plaintiffs plus several other respondents.  Rather

than reviewing all respondents, Commerce limited the "mandatory

respondents" for the Second Review to two companies – Camimex and

Minh Phu Group.[6] Selection of Respondents Memorandum, A-552-802,

2d AR 02/01/06-01/31/07 (July 18, 2007), Admin. R. Pub. Doc. 102,

at 7.  These two companies were both mandatory respondents in the

original investigation, but neither had been reviewed in the

first administrative review.

---

[6] See 19 U.S.C. § 1677f-1(c)(2) ("If it is not practicable
to make individual weighted average dumping margin determinations
. . . because of the large number of exporters or producers
involved in the investigation or review, the administering
authority may determine the weighted average dumping margins for
a reasonable number of exporters or producers by limiting its
examination to --

    (A)  a sample of exporters, producers, or types of products
         that is statistically valid based on the information
         available to the administering authority at the time of
         selection, or
    (B)  exporters and producers accounting for the largest
         volume of the subject merchandise from the exporting
         country that can be reasonably examined.")

As part of its review, because Vietnam is an NME, Commerce sent interested parties a letter asking for comments on surrogate country selection and information relating to the valuation of factors of production. Letter to Interested Parties, A-552-802, 2d AR 02/01/06-01/31/07 (Aug. 3, 2007), Admin. R. Pub. Doc. 110 ("Letter to Interested Parties").  This memorandum identified five countries from a surrogate country list that Commerce deemed to be equally economically comparable to Vietnam for administrative review purposes: Bangladesh, Pakistan, India, Sri Lanka, and Indonesia. Id. Attach. I at 2.  Because Commerce's regulations specify that it will normally value all factors of production, except for labor, by using data from a single surrogate country, 19 C.F.R. § 351.408(c)(2),[7] Commerce's letter was preliminary to its choice from the list of five.

Responding to Commerce's letter, Camimex and Minh Phu Group submitted comments in favor of selecting Bangladesh and offered

---

[7] In relevant part, 19 C.F.R. § 351.408(c) reads:

(c)  *Valuation of factors of production.* For purposes of valuing the factors of production ... under section 773(c)(1) of the Act the following rules will apply:...

    (2)  *Valuation in a single country.* Except for labor, as provided in paragraph (d)(3) of this section, the Secretary normally will value all factors in a single surrogate country.

certain surrogate value data, including the NACA Study data from Bangladesh.[8] Minh Phu & Camimex's Surrogate Country & Value Submission, A-552-802, 2d AR 02/01/06-01/31/07 (Oct. 26, 2007), Admin. R. Pub. Doc. 147.  Petitioners, in turn, requested that India serve as the surrogate country, and also offered certain publicly available surrogate value data from India. Letter from Pet'rs, A-552-802, 2d AR 02/01/06-01/31/07 (Oct. 26, 2007), Admin. R. Pub. Doc. 149.

In the Preliminary Results of the review, Commerce chose Bangladesh as the surrogate country, and used data from the NACA Study to value Bangladeshi raw shrimp. See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 73 Fed. Reg. 12,127, 12,133-34 (Dep't Commerce Mar. 6, 2008) (preliminary results, preliminary partial rescission and final partial rescission of the second antidumping duty administrative review) ("Preliminary Results").

To respond to the Preliminary Results, Plaintiff AHSTAC filed a case brief addressing, among other issues, the use of Bangladesh as a surrogate country and the use of the NACA Study data to value Bangladeshi raw shrimp. Pet'rs' Br., A-552-802, 2d

---

[8] Commerce had used Bangladesh as the surrogate country in the original, underlying, investigation, in the first administrative review, and in a new shipper review under this AD order.

AR 02/01/06-01/31/07 (May 7, 2008), Admin. R. Pub. Doc. 215, at 3, 6-8.  Rejecting AHSTAC's claim, Commerce continued with its decision to use Bangladesh as the surrogate country and to use data from the NACA Study to provide surrogate values.  Issues & Decision Mem. at 4-5; see also Final Results, 73 Fed. Reg. at 52,273 (listing no change from Preliminary Results in this regard).

Also in its Preliminary Results, Commerce calculated *de minimis* dumping margins for mandatory respondents Camimex and Minh Phu Group and granted all Plaintiffs separate rate status.[9] Preliminary Results, 73 Fed. Reg. at 12,135.  At this time, Commerce assigned all separate rate companies the average of Camimex and Minh Phu Group's margins – a *de minimis* rate.  Id.

In its Final Results, Commerce maintained *de minimis* rates for Camimex and Min Phu Group, but, rather than averaging the two mandatory respondents' rates and using the resulting average for the separate rate companies, Commerce assigned to the separate

---

[9] See Decca Hospitality Furnishings, LLC v. United States, 29 CIT 920, 921, 391 F. Supp. 2d 1298, 1300 (2005) ("While Commerce presumes that all companies [operating in an NME] are under state-control, a company may rebut this presumption, and therefore qualify for an antidumping duty rate separate from the PRC-wide rate, if it demonstrates *de jure* and *de facto* independence from government control.").  Companies qualifying for such a "separate" rate are referred to as having "separate rate status."

rate companies the most recent rate that each had received in a prior proceeding.  Specifically, the Department applied the rate that the separate rate companies had received in the original investigation, based on sales made prior to the imposition of the dumping order, except that separate rate companies that had been examined in the First Administrative Review, and which received a different rate in that review, were assigned the rate they received in the First Review. Final Results at 52,275-76.  This resulted in Vietnam Fish-One Company, Limited ("Fish One") and Grobest being assigned a zero rate (the rate received by these companies in the First Review); Minh Hai Joint-Stock Seafoods Processing Company being assigned a 4.30% rate (the rate received by this company in the original investigation, based on its own data); while all other Plaintiffs were assigned a rate of 4.57% (the rate received by these companies in the original investigation).

## Discussion

### I.   Selection of Surrogate Country

The first issue before the court is Commerce's choice of Bangladesh as a surrogate ME country.  As noted above, the selection of surrogate ME countries in the valuation of NME factors of production is regulated by 19 U.S.C. § 1677b(c)(1),

which requires that the valuation be based on "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  With regard to the choice of an "appropriate" country, the statute specifies two criteria that Commerce must use in its analysis.  Specifically:

> [Commerce] shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy country that are --
>
>> (A)  at a level of economic development comparable to that of the nonmarket economy country, and
>>
>> (B)  significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4).

For purposes of determining whether a surrogate country is at a comparable level of economic development, Commerce's regulations specify that per capita income is to be given prominence. See 19 C.F.R. § 351.408(b) ("*Economic Comparability*. In determining whether a country is at a level of economic development comparable to the nonmarket economy [country] . . ., the Secretary will place primary emphasis on *per capita* GDP as the measure of economic comparability.").[10]

Procedurally, in selecting a surrogate country, Commerce, as

---

[10] No party challenges Commerce's use of per capita Gross National Income ("GNI") as a proxy for per capita GDP.

a matter of policy, follows a four-step process.  First, Commerce compiles a list of countries that are at a level of economic development "comparable" to the country being investigated. Secondly, Commerce ascertains which, if any, of those countries produce comparable merchandise.  Third, from the resulting list of countries, Commerce then determines which, if any, of the countries are significant producers of the comparable merchandise.  Finally, Commerce evaluates the reliability and availability of the data from the countries that are significant producers. See Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process (Dep't Commerce Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last visited Sept. 23, 2009) ("Policy Bulletin").

Following this process in the Second Review, Commerce, as noted above, prepared a list of five possible surrogate countries and then stated that, for purposes of the review, Commerce would consider all five to be "equally economically comparable" to Vietnam.  This list included Pakistan, India, Sri Lanka, and Indonesia, in addition to Bangladesh, the country eventually chosen as the surrogate country. See Letter to Interested Parties, Admin. R. Pub. Doc. 110, Attach. I at 2; Issues & Decision Mem. 4.

AHSTAC challenges this determination, noting that the countries on Commerce's list do not have equal *per capita* GDP; nor are they equally distant from Vietnam by this measure. In particular, India, the potential surrogate country favored by AHSTAC, appears to be closer to, and thus more "comparable" to Vietnam in this ragard than is Bangladesh. See Letter to Interested Parties, Admin. R. Pub. Doc. 110, Attach. I at 2.

In response, Commerce and Defendant-Intervenors argue, correctly, that Commerce is not required to select more than one surrogate country, 19 C.F.R. § 351.408(c)(2), and that Commerce may give significant weight to data quality in determining an appropriate surrogate country. See Globe Metallurgical, Inc. v. United States, Slip Op. 08-105, 2008 Ct. Intl. Trade LEXIS 105, at *10-11 (CIT Oct. 1, 2008) (concluding that Commerce acted reasonably in selecting a surrogate country based on its superior quality of available data relative to other comparable market economies). However, this response provides no support for Commerce's determination of economic comparability. Even assuming, *arguendo*, that Commerce has provided evidence of data superiority that could, if accepted by the court,[11] support the

---

[11] Whether this evidence is sufficient and should be accepted by the court is a substantial part of the second question before the court. For now, however, we will assume a positive answer to this question.

selection of Bangladesh as the surrogate country over India, this is not a basis for assuming that Bangladesh and India are equally comparable to Vietnam in terms of *per capita* GDP.

Nor has Commerce explained why the difference between Bangladesh and Vietnam, in *per capita* GDP, is not relevant in this case or why the difference in economic similarity to Vietnam is outweighed by the differences in quality of data between Bangladesh and India.  Rather, without explanation, Commerce has adopted a policy of treating all countries on the surrogate country list as being equally comparable to Vietnam.  As Commerce's chosen designation has not been supported by any justification or evidence at all, it is not supported by substantial evidence. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys, Inc., 419 U.S. 281, 285 (1975) (explaining that, even under the narrower arbitrary and capricious standard of review, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made" (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))).[12]

---

[12] Moreover, a reviewing court should not attempt itself to make up for such deficiencies; "we may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman, 419 U.S. at 285-86 (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)); Atchison, Topeka & Santa Fe Ry. v.

Finally, Commerce's designation of equal economic comparability prevents the court from determining whether the selection of Bangladesh, as opposed to India, on the basis of the purportedly better data, is reasonable considering the record as a whole.

The Department argues that this court's decision in Fujian Lianfu Forestry Co. v. United States, Slip Op. 09-81, 2009 WL 2461012 (CIT Aug. 10, 2009), rejected "an identical challenge to Commerce's surrogate country selection methodology to that raised by Ad Hoc." (Def.'s Notice of Subsequent Authority 2.)  But Fujian Lianfu Forestry is distinguishable, as a comparison of the level of explanation provided by Commerce in each case indicates.

In Fujian Lianfu Forestry, the court upheld, as supported by substantial evidence, Commerce's treatment of all potential surrogate countries on its surrogate country list as equally economically comparable to the NME at issue in that case, despite the "parties' arguments that India[the chosen surrogate country]'s GNI (USD 620) was too disparate from China[the NME]'s (USD 1290) for India to be considered 'economically comparable.'" Fujian Lianfu Forestry, 2009 WL 2461012, at *16-17.  In support of its determination in that case, Commerce had offered the

Wichita Bd. of Trade, 412 U.S. 800, 807 (1973)(plurality)("[T]he agency must set forth clearly the grounds on which it acted.").

following explanation:

> While the Department's regulations at 19 CFR 351.408
> instruct the Department to consider per capita income
> when determining economic comparability, neither the
> statute nor the Department's regulations define the
> term 'economic comparability.'  As such, the Department
> does not have a set range within which a country's GNI
> per capita could be considered economically comparable.
> In the context of the World Development Report, which
> contains approximately 180 countries and territories,
> the difference in GNI per capita between India and the
> PRC is minimal.  As previously stated in the Surrogate
> Country Selection Memo, 'while the difference between
> the PRC's USD1290 per capita GNI and India's USD620 per
> capita GNI in 2004 seems large in nominal terms, seen
> in the context of the spectrum of economic development
> across the world, the two countries are at a fairly
> similar stage of development.'  For example, in the
> World Development Report the four countries immediately
> higher than China in per capita GNI were Egypt (which
> was on the list of potential surrogate countries),
> Morocco, Columbia [sic], and Bosnia.  Their per capita
> GNIs were higher than China's by USD20, USD230, USD710,
> and USD750, respectively.  India's GNI per capita was
> only USD670 lower than China's.  Therefore, the
> Department disagrees with the contention that India is
> no longer ecomoically comparable to the PRC.

Id. (quoting Issues & Decision Mem. for 2004-2005 Admin. Rev. of

Wooden Bedroom Furniture from the People's Republic of China,

A-570-890, AR 06/24/04-12/31/05 (Aug. 8, 2007), available at

http://ia.ita.doc.gov/frn/summary/prc/E7-16584-1.pdf (last

visited Sept. 23, 2009)).

Here, in contrast to Fujian Lianfu Forestry, Commerce has

failed to provide more than conclusory reasoning for why the GNI

discrepancy between Vietnam and the countries on the Surrogate

Country List did not affect the Department's comparability

determination.  Rather, as noted above, Commerce devised its Surrogate Country List without explanation and, again without explanation, adopted a policy of treating all countries on this list as being equally comparable to Vietnam.[13]  Significantly, the Department's Policy Bulletin states that each Surrogate Country Memorandum must explain how the chosen country satisfies each element of the statutory criteria.  In accordance with the Department's own policy, therefore, the Surrogate Country Memorandum must explain why its chosen surrogate country is at a level of economic development comparable to Vietnam. See 19 U.S.C. § 1677b(c)(4)(A).  The memorandum in this case does not do so. See Second Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Selection of a Surrogate Country, A-552-802, 2d AR 02/01/06-01/31/07 (Feb. 28, 2008), Admin. R. Pub. Doc. 186, at 6-7.  Accordingly, the court cannot find on this record that Commerce's surrogate country selection is supported by substantial evidence.

For these reasons the court must remand this issue to Commerce so that it may: 1) explain why it is justified in

---

[13] As the court's opinion in Fujian Lianfu Forestry was not issued until August 10, 2009, we will not assume that Plaintiff was on notice of the Department's position at the time of the administrative proceeding here.

treating all the countries on the surrogate country list as equally comparable to Vietnam, despite their differences in *per capita* GDP, or 2)explain why the difference in comparability to Vietnam in *per capita* GDP between India and Bangladesh is small enough that it may be outweighed by superior quality of the Bangladeshi data, providing a reasoned basis for the determination of such superiority, or 3) otherwise reconsider its determination in accordance with this opinion.


II. Use of NACA Study

The second issue before the court is whether Commerce's decision to value raw shrimp based on the surrogate value data contained in the NACA Study, *supra*, is supported by substantial evidence on the record.[14]  In making this selection, Commerce rejected data submitted by the petitioners, specifically a price quote for Indian shrimp submitted by affidavit and a public list of ranged shrimp prices from an Indian shrimp processor. Plaintiffs claim that the Bangladeshi data is inferior to the Indian data, and that Commerce should have, therefore, used the Indian data in the valuation of raw shrimp.

---

[14] Commerce's selection of the NACA study was, to some degree, based on its selection of Bangladesh as the surrogate country. See *supra*.

In considering the validity of proposed surrogate values, Commerce seeks to weigh the specificity, the accuracy, and the contemporaneity of the proposed data. See Preliminary Results, 73 Fed. Reg. at 12,134.  In making such evaluations Commerce considers (1) whether the surrogate value is product-specific; (2) whether the surrogate value is representative of a range of prices within the POR; (3) whether a surrogate value is a non-export value; and (4) whether the surrogate value is tax exclusive. See, e.g., Polyethylene Retail Carrier Bags from the People's Republic of China, 69 Fed. Reg. 34,125 (Dep't Commerce June 18, 2004)(final determination of sales at less than fair value), and accompanying Issues & Decision Memorandum, A-570-886 (June 18, 2004), available at http://ia.ita.doc.gov/frn/summary/prc/04-13815-1.pdf (last visited Sept. 23, 2009) 44; Manganese Metal from the People's Republic of China, 60 Fed. Reg. 31,282, 31,284 (Dep't Commerce June 14, 1995) (preliminary determination of sales at less than fair value); accord Dorbest, 30 CIT at 1686, 462 F. Supp. 2d at 1276.

As noted above, in making its selection, Commerce is required to select "the best available information regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1).  Because "best available information" is

not defined in the statute, Commerce has significant discretion in making this determination. See Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999). Nonetheless, for Commerce's conclusion to be supported by substantial evidence, the court must be satisfied that, viewing the record as a whole, a reasonable mind could conclude that Commerce chose the best available information. See Dorbest, 30 CIT at 1676-77, 462 F. Supp. 2d at 1269.

For the court to conclude that a reasonable mind would support Commerce's selection of the NACA Study as the best available information, Commerce needed to justify its selection. See Olympia Indus., Inc. v. United States, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998) ("Commerce has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable."). In doing so, Commerce must "conduct a fair *comparison* of the data sets on the record" with regard to its announced method or criteria. Allied Pac. Food (Dalian) Co. v. United States, 30 CIT 736, 757, 435 F. Supp. 2d 1295, 1313-14 (2006)(emphasis added).

The court cannot now determine, however, whether Commerce has conducted the required analysis because, as noted above, one aspect of Commerce's evaluation of proposed surrogate values is

that the agency "normally will value all factors in a single
surrogate country." 19 C.F.R. § 351.408(c)(2).  While the word
"normally" leaves the agency some flexibility, the "single
country" aspect of the agency's regulation still has the
potential to affect its data choices.  Thus, if on remand
Commerce chooses another surrogate country, it will need to re-
visit its analysis of its data choices for valuing raw shrimp.
The court, therefore, will defer further consideration of this
issue until the remand determination is complete.

        III.    Separate Rate Determination

        As noted above, in order for the court to uphold, as
supported by substantial evidence on the record, Commerce's
application of a dumping margin as reasonable for the Plaintiffs,
the margin must be based on "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Matsushita, 750 F.2d at 933 (quoting Universal
Camera, 340 U.S. at 477).  To allow the court to so conclude,
Commerce must articulate a "rational connection between the facts
found and the choice made," Burlington Truck Lines, 371 U.S. at
168, explaining why the rate chosen "is based on the best
available information and establishes antidumping margins as
accurately as possible." Shakeproof Assembly Components, Div. of

Ill. Tool Workers, Inc. v. United States, 268 F.3d 1376, 1382
(Fed. Cir. 2001). For the reasons given below, based on the
record here, Commerce's decision to assign dumping margins to
Plaintiffs based only on the rates they were assigned in prior
proceedings does not meet this standard.

To determine the dumping margin for non-mandatory
respondents in NME cases (that is, to determine the "separate
rates" margin), Commerce normally relies on the "all others rate"
provision of 19 U.S.C. § 1673d(c)(5). See Issues & Decision Mem.
18-19. This subsection provides a general rule and an exception
for determining such rates. The general rule states that "the
estimated all-others rate shall be an amount equal to the
weighted average of the estimated weighted average dumping
margins established for exporters and producers individually
investigated, excluding any zero and de minimis margins, and any
margins determined entirely under section 1677e [determinations
on the basis of facts available]." 19 U.S.C. § 1673d(c)(5)(A).

The exception found in 19 U.S.C. § 1673d(c)(5)(B) applies in
cases where, as here, the dumping margins established for all
individually investigated exporters or producers are zero or *de
minimis*. In such cases, the agency "may use any reasonable
method to establish the estimated all-others rate for exporters
and producers not individually investigated, *including* averaging

the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B)(emphasis added).  Commerce therefore is not precluded from following the method that it used in the Preliminary Results, where it assigned the weighted average of the mandatory respondents' rates to the Plaintiffs, resulting in their being assessed a *de minimis* rate. See Preliminary Results, 73 Fed. Reg. at 12,135.  Rather, as a legal matter, Commerce may choose to include or to exclude the mandatory respondents' zero or *de minimis* margins in calculating a separate rate. See 19 U.S.C. § 1673d(c)(5)(B).

All parties agree that the mandatory respondents are presumed to be representative of the respondents as a whole; consequently, the average of the mandatory respondents' rates may be relevant to the determination of a reasonable rate for the separate rate respondents.  More particularly, that the mandatory respondents in the current review were found not to be engaged in dumping was evidence indicating that the responding separate rate Plaintiffs may also no longer be engaged in dumping.

This conclusion is bolstered by other recent investigations of shrimp producers and exporters from Vietnam.  In the First Administrative Review of the underlying dumping order, for example, respondents Fish One and Grobest each received zero

rates. <u>Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam</u>, 72 Fed. Reg. 52,052, 52,054 (Dep't Commerce Sept. 12, 2007) (final results of first antidumping duty administrative review and first new shipper review).  Thus there is at least some evidence to suggest that Vietnamese shrimp producers changed their pricing behavior so as to comply with the antidumping order, as is the intention of such orders.  Whether or not this evidence alone is sufficient to compel a conclusion that only a *de minimis* rate could reasonably be applied to the separate rate Plaintiffs, it is evidence on the record in support of the reasonableness of such application.

     That Commerce has, in the past, awarded separate rate respondents the weighted average of the mandatory respondent rates, even when all of the mandatory respondent rates are *de minimis*, supports this conclusion. <u>See</u> <u>Brake Rotors From the People's Republic of China</u>, 73 Fed. Reg. 32,678 (Dep't Commerce June 10, 2008) (final results of 2006-2007 administrative and new shipper review and partial rescission of 2006-2007 administrative review), and accompanying Issues and Decision Memorandum, A-570-846, AR & NSR 04/01/06-03/31/07 (June 10, 2008), <u>available at</u> http://ia.ita.doc.gov/frn/summary/PRC/E8-13001-1.pdf (last visited Sept. 23, 2009); <u>Honey from Argentina</u>, 72 Fed. Reg. 73,763 (Dep't Commerce Dec. 28, 2007) (preliminary results of

antidumping duty administrative review and intent not to revoke in part) & 73 Fed. Reg. 24,220, 24, 221 (Dep't Commerce May 2, 2008) (final results of antidumping duty administrative review and determination not to revoke in part) (leaving separate rate determination unchanged).[15]

Nonetheless, when the weighted average of *all* exporters and producers individually investigated is zero or *de minimis*, Commerce is not required to use such weighted average as the separate or all-others rate, provided that it uses another "reasonable method to establish the estimated all-others rate." 19 U.S.C. § 1673d(c)(5)(B).  The question before the court, therefore, is whether there is substantial evidence to support Commerce's choice to assign to Plaintiffs a rate from the original underlying investigation, or from the First Review – i.e., whether that determination was reasonable based on the record before us.[16]  Because Commerce's choice must be reasonable

---

[15] Commerce seeks to distinguish these decisions, arguing that the companies concerned therein were "fairly homogenous" and that no rates in those cases were determined on the basis of total or adverse facts available. (Def.'s Resp. to Pls.' Mots. for J. Upon Admin. R. 26 ("Def.'s Resp.").)  But Commerce ignores its own decision here, as in these prior decisions, to select mandatory respondents to represent the practice in the industry.

[16] In its briefing of this issue, Commerce relies on the decision of the court in Longkou Haimeng Mach. Co. v. United States, __CIT__, 581 F. Supp. 2d 1344 (2008). (Def.'s Resp. 18.) In Longkou, the court affirmed Commerce's choice to exclude from the separate rate determination any zero or *de minimis* rates, in

given the record as a whole, Nippon Steel, 458 F.3d at 1351, such choice requires evidence which a reasonable mind could find sufficient to offset the evidence supporting Commerce's assignment of *de minimis* rates to the cooperative uninvestigated respondents in the preliminary investigation results.

Commerce, however, has not provided us with sufficient evidence on the record which could justify ignoring the evidence in favor of assigning a *de minimis* rate to Plaintiffs and which would support as reasonable the alternative rate chosen. Nor has Commerce articulated a clear justification for choosing the dumping margins that it assigned. While relying on 19 U.S.C. § 1673d(c)(5)(B), see Issues & Decision Mem. at 19, "Commerce abandoned the methodology [involving] weight-averaging the estimated dumping margins of the Fully-Investigated Respondents[] even though that method is specifically provided for in . . . 19 U.S.C. § 1673d(c)(5)(B)[]." Yantai Oriental Juice Co. v. United States, 27 CIT 477, 487 (2003) (citation omitted). The

---

light of the statute's clear grant of permission for such a choice. Longkou, __ CIT at __, 581 F. Supp. 2d at 1357-60. The issue here, however, is not the exclusion of zero or *de minimis* rates, but whether there is evidence to support Commerce's selected rate as reasonable considering the record as a whole. Importantly, in Longkou, in determining the rate to be applied to the non-selected respondents, Commerce assigned the non-selected, cooperative respondents a weighted-average percentage margin based on the calculated margins of the other mandatory respondents. Longkou, 581 F. Supp. at 1354, 1358.

sole reasoning that the Department provided for this decision was that thirty-five companies received margins based on AFA and that "the circumstances of this review are similar to those of the preceding review," Final Results, 73 Fed. Reg. at 52,275; Issues & Decision Mem. at 19, thereby explaining the use of margins established during the First Review for Fish One and Grobest and those established during the initial investigation for all other respondents.

But the Department's reference to the existence of thirty-five additional, non-cooperating companies named in the Second Review – who did not submit separate rate applications or file any other papers and were therefore assigned rates based on adverse facts available[17] – fails to justify its choice of dumping margin for the cooperative uninvestigated respondents. As this court indicated in Yantai, there is no basis in the statute for penalizing cooperative uninvestigated respondents due solely to the presence of non-cooperative uninvestigated respondents who receive a margin based on AFA. See Yantai, 27 CIT at 487. While

_____

[17] See 19 U.S.C. § 1677e(b)("If the [agency] finds that an interested party has failed to cooperate . . . [the agency] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."). As noted by Plaintiffs, there is some reason to doubt that these non-cooperating companies, if they exist at all, export to the United States to any substantial degree. We may leave that aside for now.

under the "facts available" section of the antidumping statute, 19 U.S.C. § 1677e(b)(2),(3), Commerce may assign, to non-cooperating companies, dumping margins that are based on prior investigations, this section is only applicable when a party, "(A) withholds information that has been requested by the administering authority," "(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested", or "(C) significantly impedes a proceeding under this title." 19 U.S.C. § 1677e(a). None of these factors apply in this case, and Commerce has not stated that any of the Plaintiffs were non-cooperative. See Final Results, 73 Fed. Reg. at 52,274. Therefore, 19 U.S.C. § 1677e does not provide a basis for the Department's use of results from a prior determination with respect to the cooperating companies in the present case.

With respect to the second ground offered in support of Commerce's chosen methodology – that "the circumstances of this review are similar to those of the preceding review," Final Results, 73 Fed. Reg. at 52,275; Issues & Decision Mem. at 19 – the court notes that at oral argument, the Government observed that there were two mandatory respondents in the First Review who chose not to participate and who received AFA rates as a result. See also Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam, 72 Fed. Reg. 10,689, 10,691-93 (Dep't

Commerce Mar. 9, 2007) (preliminary results of first antidumping duty administrative review and new shipper review).  While the court takes no position as to the weight of this evidence, we note that, as mandatory respondents are selected to be representative of the industry, there is thus some evidence in the record that, at least during the POR in the First Review, could support an inference that dumping of the subject merchandise from Vietnam was continuing.

Nevertheless, nowhere in the record does Commerce provide sufficient reasoning linking the evidence to its conclusion that margins established for past periods of review, and especially those established during the period of investigation, prior to the imposition of the antidumping duty order, are "based on the best available information and establish[] [the relevant] antidumping margins as accurately as possible." Shakeproof, 268 F.3d at 1382.  As noted above, in Chenery, 332 U.S. at 196, the Supreme Court stressed the "simple but fundamental rule of administrative law" that:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

Id.  Further, "[i]f the administrative action is to be tested by

the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable[;] [i]t will not do for a court to be compelled to guess at the theory underlying the agency's action." Id. at 196-97.  On the record before us, no adequate explanation is presented and, accordingly, the court declines to read into the record a justification which Commerce itself did not provide.

On remand, therefore, Commerce must either assign to Plaintiffs the weighted average rate of the mandatory respondents, or else must provide justification, based on substantial evidence on the record, for using another rate.

### Conclusion

Accordingly, this matter is remanded to the agency for further consideration in accordance with this opinion.  Commerce shall have until December 29, 2009 to complete and file its remand redetermination.  Plaintiffs shall have until January 29, 2010 to file comments.  Defendant and Defendant-Intervenors shall have until February 15, 2010 to file any reply.

It is **SO ORDERED.**

/s/ Donald C. Pogue  
Donald C. Pogue, Judge

Dated:      September 29, 2009  
            New York, N.Y.