Slip Op. 10-44

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BRISTOL METALS L.P., FELKER BROTHERS CORP., MARCEGAGLIA USA INC., and OUTOKUMPU STAINLESS PIPE, INC., | Before: Leo M. Gordon, Judge |
| Plaintiffs, | |
| v. | Court No. 09-00127 |
| UNITED STATES, | |
| Defendant. | |

**OPINION**

[Final remand results sustained.]

Dated: April 20, 2010

Schagrin Associates (Roger B. Schagrin), Michael J. Brown) for Plaintiffs Bristol Metals, LP, Felker Brothers Corp., Marcegaglia USA Inc., and Outokumpu Stainless Pipe Co. Inc.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Action, U.S. Department of Justice (Joshua E. Kurland, Trial Attorney); and Office of the Chief Counsel for Import Administration, U.S. Department of Commerce (David W. Richardson, of counsel) for Defendant United States.

Gordon, Judge:  This action involves the final less than fair value determination of the U.S. Department of Commerce ("Commerce") in the antidumping investigation covering circular welded austenitic stainless pressure pipe from the People's Republic of China.  See Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China, 74 Fed. Reg. 4913 (Dep't of Commerce Jan. 28, 2009) (final determ.) ("Final Determination"), and accompanying Issues and Decision Memorandum

for Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China, A-570-930 (Jan. 21, 2009), available at http://ia.ita.doc.gov/frn/summary/PRC/E9-1827-1.pdf ("Decision Memorandum") (last visited Apr. 20, 2010). Before the court are the Final Results of Redetermination (Jan. 5, 2010) ("Remand Results") filed by Commerce pursuant to Bristol Metals L.P. v. United States, Court No. 09-00127 (Oct. 23, 2009) (remand order). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

## I. Background

Respondents Zhejiang Jiuli Hi-Tech Metals Co., Ltd. ("Jiuli") and Winner Machinery Enterprise Co., Ltd ("Winner") submitted separate rate applications during the antidumping investigation. Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China, 73 Fed. Reg. 51,788 (Dep't of Commerce Sept. 5, 2008) (prelim. determ.). Although Jiuli and Winner each qualified for separate rates (apart from the China-wide rate), id. at 51,792, Commerce chose to individually investigate only Winner, who accounted for the largest volume of subject merchandise. Commerce preliminarily calculated a company-specific dumping margin for Winner (22.03 percent), which it then assigned to Jiuli. Id.

At verification Winner withdrew from the investigation and refused to further cooperate. 74 Fed. Reg. at 4913. In the Final Determination Commerce applied adverse facts available to Winner pursuant to 19 U.S.C. § 1677e, treating Winner as

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

part of the China-wide entity, which Commerce assigned an adverse facts available rate of 55.21 percent, the highest computer control number ("CONNUM") specific calculated dumping margin from Winner's unverified data. Id. at 4914-15. Commerce assigned Jiuli, an otherwise willing and cooperative respondent not selected for individual investigation, a separate sample pool rate that Commerce calculated from the margins contained in the antidumping petition (10.53 percent). Id. at 4914.

Plaintiffs could not challenge the assignment of Jiuli's sample pool rate during the administrative proceeding because the events with Winner unfolded after the preliminary determination and Commerce first assigned Jiuli a separate sample pool rate in the Final Determination. It was not until their brief before the court that Plaintiff had the first opportunity to challenge Commerce's (1) decision to assign Jiuli a sample pool rate (as opposed to the China-wide rate), Pls.' Mot. J. Agency R. 3-8, and (2) Commerce's surrogate valuation of stainless steel to calculate the sample pool rate. Id. at 8-10. Defendant, in turn, requested a voluntary remand to address Plaintiffs' arguments in the first instance, which the court granted. Bristol Metals L.P. v. United States, Court No. 09-00127 (Oct. 23, 2009) (remand order). In their comments on the Remand Results, Plaintiffs continue to challenge Commerce's surrogate valuation of stainless steel, and the assignment of a sample pool rate to Jiuli.

## II. Standard of Review

When reviewing Commerce's antidumping determinations, the court sustains Commerce's determinations, findings, or conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  See also Dorbest Ltd. v. United States, 30 CIT 1671, 1675-76, 462 F. Supp. 2d 1262, 1268 (2006) (providing a comprehensive explanation of the standard of review in the nonmarket economy context).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Dupont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 10.3[1] (2d. ed. 2009).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2009).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of

Commerce's interpretation of the antidumping statute. <u>Dupont</u>, 407 F.3d at 1215; <u>Agro Dutch Indus. Ltd. v. United States</u>, 508 F.3d 1024, 1030 (Fed. Cir. 2007). "[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under <u>Chevron</u>." <u>Pesquera Mares Australes Ltda. v. United States</u>, 266 F.3d 1372, 1382 (Fed. Cir. 2001); <u>see also</u> <u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1359 (Fed. Cir. 2007) ("[W]e determine whether Commerce's statutory interpretation is entitled to deference pursuant to <u>Chevron</u>.").

## III. Discussion

### A. Commerce's Surrogate Valuation of Stainless Steel Inputs

Valuation of factors of production in a nonmarket economy ("NME") case is governed by 19 U.S.C. § 1677b(c), which directs Commerce to use the "best available information" in determining surrogate values. 19 U.S.C. § 1677b(c)(1)(B). The antidumping statute also directs Commerce to use values from an appropriate surrogate country to the extent possible. 19 U.S.C. § 1677b(c)(4). Commerce's regulations provide that surrogate values should normally be "publicly available" and (other than labor costs) from a single surrogate country. 19 C.F.R. § 351.408(c) (2007). In addition to the statutory and regulatory preference for using surrogate country data, Commerce prefers data that is publicly available, reflects a broad market average, is contemporaneous with the period of review, is specific to the input in question, and is exclusive of taxes on exports. <u>See, e.g.</u>, <u>Certain New Pneumatic Off-the-Road Tires from the People's Republic of China</u>, 73 Fed. Reg. 40,485 (Dep't of Commerce July 15, 2008) and accompanying Issues and Decision Memorandum, at cmt. 10.

Here, as is sometimes the case, no data set from the record perfectly satisfies Commerce's preferences. After reviewing the information available in the record, Commerce determined that the "best available information" for the surrogate value of the stainless steel input used in the subject merchandise was World Trade Atlas Indian Import data for HTS 7219 and 7220 ("WTA data"), which are the two HTS categories that include grades 304 and 316 stainless steel that Plaintiffs cited in the petition. See Remand Results at 7; Circular Welded Austenitic Stainless Pressure Pipe from the People's Republic of China, 73 Fed. Reg. 10,221, 10,224 (Dep't of Commerce Feb. 26, 2008) (init. notice) ("Initiation Notice"). Commerce's selection of the WTA data was reasonable because Commerce determined, and the record supports, that the data substantially satisfies the criteria Commerce applies in identifying an appropriate surrogate value. Commerce also determined (and the record supports) that its only weakness (coverage of a broader range of steel than the two grades used by Plaintiffs) did not negate its superiority to the alternative data sets advocated by Plaintiffs.

Specifically, as explained in the Remand Results, Commerce determined that the WTA data was from a reliable, publicly available source that Commerce regularly uses for surrogate values. Remand Results at 7. Commerce next determined that the WTA data matched its criteria because the data consists of average, tax exclusive values. Id. Commerce also determined that the data reflected the prices paid in actual transactions (as opposed to offers that may vary significantly from final prices). Id. In addition, Commerce determined the WTA data was contemporaneous with the period of investigation. Id. Finally, Commerce acknowledged that the WTA data was not a

perfect complement to the particular grades of stainless steel cited in the petition, but explained that the WTA data did represent "an import category that covers imports of the type of steel for which Plaintiff has provided alternative surrogate values."[2] Id.; see also id. at 10 (stating "the WTA import data . . . reflects actual prices paid for imports under an HTS category applicable to the stainless steel grades offered for sale on the [Steel Authority of India Ltd.] price list. . . . Therefore, while the WTA import data . . . may not distinguish between grades of stainless steel, we continue to find that it is more appropriate as the source of a surrogate value given the faults of the data proposed by Plaintiffs.").

Equally important, the WTA data comes from India, the primary surrogate country advocated by Plaintiffs, and chosen by Commerce for use in valuing factors of production. Remand Results at 7. Hence, in using the WTA data, rather than data sets that were not from a surrogate country or of unknown origin, Commerce adhered to the statutory mandate to use surrogate country data to the extent possible, as well as its regulatory preference for valuing inputs from a single surrogate country. See 19 U.S.C. § 1677b(c)(4); 19 C.F.R. § 351.408(c)(2). As Commerce noted: "given that the remainder of the surrogates used by [Commerce] to value the factors of production were from India, we find it even more appropriate to not use a surrogate value from the

---

[2]The record also indicates that there is a viable market in India for the stainless steel used in Plaintiffs' product, as evidenced by Plaintiffs' advocacy of India as a surrogate country because it is a "significant producer" of the product. See Initiation Notice, 73 Fed. Reg. at 10,223 (citing Petition, at 6-7); Petitioners Comments on Surrogate Selection, Pub. Rec. Doc. 66, at 2-3.

United States to value stainless steel." <u>Remand Results</u> at 10 (citing 19 C.F.R. § 351.408(c)(2)).

Commerce also explained its basis for rejecting the alternative data sets advocated by Plaintiffs. First, Plaintiffs argue that Commerce should have calculated the surrogate values using either Plaintiffs' own costs for grades 304 and 316 or those reported by the American Metal Market. Pls.' Cmts. at 2. Commerce explained, however, that these data sets are poor surrogates for metal prices in China because the United States is not an acceptable surrogate country for China. <u>See</u> <u>Remand Results</u> at 10. Although Commerce has occasionally used United States data as a last resort when the record lacks surrogate country data, in this case the WTA data came from India, the surrogate country that Plaintiffs advocated and Commerce selected. Commerce's decision to use the Indian WTA data rather than the United States data is consistent with the statutory and regulatory provisions requiring Commerce to use surrogate country data to the extent possible. <u>See</u> 19 U.S.C. § 1677b(c)(4); 19 C.F.R. § 351.408(c). <u>See also</u> <u>Remand Results</u> at 10. In addition, Plaintiffs' suggestion that Commerce use Plaintiffs' own cost data fails to satisfy Commerce's preference to use publicly available information.

The next data set Plaintiffs advocate, grades 304 and 316 steel prices from Management Engineering & Production Services ("MEPS"), suffers from similar deficiencies. As Commerce explained, the MEPS data provide no information regarding the countries from which it was derived. <u>Remand Results</u> at 7, 10. The data potentially includes prices from non-surrogate countries; it also potentially includes prices from

nonmarket economy countries and those that maintain broadly available export subsidies that are inappropriate for use in valuing factors of production. Id. Commerce concluded that use of such data would thus not provide reliable information on which to calculate a surrogate value for stainless steel from China and would conflict with Commerce's statutory preference for data from a single, appropriate surrogate country.

The final alternative data set that Plaintiffs advocate is a price list from the Steel Authority of India Ltd. ("SAIL"). Pls.' Cmts. at 2. Commerce explained that it prefers actual prices over price lists because price lists may not reflect the prices paid in actual transactions. Remand Results at 7, 10. Price lists, which constitute a producer's opening offer, may be just the starting point in a negotiation that could result in a significantly different final sale price. They also represent the experience of a single producer, rather than a broad market average. See Laminated Woven Sacks from the People's Republic of China, 73 Fed. Reg. 35,646 (Dep't of Commerce June 24, 2008) and accompanying Issues and Decision Memorandum, cmts. 2 & 3. Unlike the SAIL price list, the WTA data report actual prices paid for stainless steel imports throughout India (including grades 304 and 316). Remand Results at 10. Hence, Commerce reasonably determined that the WTA data better met its criteria.

The issue here closely resembles one decided by the court in Polyethylene Retail Carrier Bag Comm. v. United States, 29 CIT 1418, 1436-45 (2005). In Polyethylene Retail a party challenged Commerce's use of Indian HTS data to calculate the surrogate value of an input in an antidumping investigation because the data was not as specific as alternatives that party proposed. As in this case, Commerce determined that the

less-specific HTS data was still the "best available information" because of more serious flaws with the proposed alternatives. The court recognized that the "broad [Indian HTS] basket provisions include a large number of products Plaintiffs did not use to produce the subject merchandise," id. at 1437, but nonetheless upheld Commerce's determination that the Indian HTS data was still the best data available, stating that it would not "substitute its own evidentiary evaluation for Commerce's." Id. at 1445.

Here, Commerce provided a reasoned basis for determining that the WTA data it used both met its criteria for selecting surrogate values and constituted better data than the alternatives proposed by Plaintiffs. As in Polyethylene Retail, the court is reluctant to "substitute its own evidentiary evaluation for Commerce's," id., and to substitute its own judgment for the agency's in considering and weighing the relative importance of the various criteria applied. The important point is that Commerce carefully considered each of its announced criteria against the alternative data sources on the record, and proffered a reasoned explanation for its ultimate choice. With that said, Commerce's surrogate value selection for stainless steel inputs is reasonable, and therefore supported by substantial evidence.

### B. Whether Jiuli Is Entitled to a Separate Rate

An exporter may "affirmatively demonstrate its entitlement to a separate, company-specific margin by showing an absence of central government control, both in law and in fact, with respect to exports." Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (citation omitted); Pls.' Cmts. at 7 (quoting Sigma). Jiuli made such a showing in this case. Id. at 10. Nonetheless, Plaintiffs argue that Jiuli may only

qualify for a separate margin if it submitted "company-specific price and cost data to [Commerce] . . . in addition to showing an absence of government control." Id. at 7; see also id. at 8-9. Plaintiffs' arguments are unpersuasive.

Commerce has a well-established administrative practice of calculating a separate rate for those responsive companies that are part of the "sample pool" for an investigation and for which Commerce lacks the resources to investigate individually. Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, at 2, 3-4, 6 (Apr. 5, 2005), available at http://ia.ita.doc.gov/policy/bull05-1.pdf (explaining separate rate practice and stating Commerce will calculate a separate rate for the "pool of non-investigated firms" in an NME proceeding). See also Certain Kitchen Appliance Shelving and Racks From the People's Republic of China, 74 Fed. Reg. 9591, 9596-97 (Dep't of Commerce Mar. 5, 2009) (applying separate rate to pool of cooperating, non-investigated respondents); Sodium Hexametaphosphate From the People's Republic of China, 73 Fed. Reg. 6479, 6480-81 (Dep't of Commerce Feb. 4, 2008) (same).

The court, in turn, has upheld Commerce's practice of calculating this kind of rate. Coalition for the Pres. of Am. Brake Drum and Rotor Aftermkt. Mfrs. v. United States, 23 CIT 88, 111, 44 F. Supp. 2d 229, 251 (1999) (explaining that Commerce's approach has the "weight of fairness and common sense"). Although Brake Drum did not use the precise term "sample pool rate," it involved the exact same kind of rate Commerce applied here. See Brake Drums and Brake Rotors from the People's Republic of China, 62 Fed. Reg. 9160, 9162 (Dep't of Commerce Feb. 28, 1997)

(stating Commerce applied a separate rate to exporters that "cooperated with our investigations but which were not selected as respondents").

The court cannot identify any support in the statute or case law to substantiate Plaintiffs' argument that companies like Jiuli may not qualify for a separate rate unless they meet an additional requirement of submitting company-specific price and cost data, even if Commerce makes no such request. Such a requirement would eviscerate Commerce's separate rate policy. See Policy Bulletin 05.1, at 4 (separate rate application "will replace the requirement that [non-selected firms] respond to Section A of the Department's questionnaire").

In the Remand Results Commerce explained the difference between "all others" rates and "sample pool" rates: once established in an investigation, an "all others" rate does not change in subsequent administrative proceedings, whereas a "sample pool" rate may change from one review to another (or not be calculated at all). Remand Results at 2, 3, 12. In NME proceedings, Commerce typically need not calculate an "all others" rate because Commerce presumes that all producers and exporters either qualify for a rate separate from the NME entity or are assumed to be part of the entity. Remand Results at 2-3, 13 (citing Brake Drum, 23 CIT at 107, 44 F. Supp. 2d at 248. Nevertheless, when calculating an NME "sample pool" rate, Commerce is guided by the "all others rate" provision, 19 U.S.C. § 1673d(c)(5). Amanda Foods (Vietnam) Ltd. v. United States, 33 CIT ___, ___, 647 F. Supp. 2d 1368, 1379 (2009) ("To determine the dumping margin for non-mandatory respondents in NME cases (that is, to determine the

"separate rates" margin), Commerce normally relies on the 'all others rate' provision of 19 U.S.C. § 1673d(c)(5).").

Plaintiffs contend that Commerce is prohibited from calculating a separate rate for Jiuli because 19 U.S.C. § 1673d(c)(5) first requires Commerce to have calculated an individually-investigated rate for another respondent that demonstrated its independence from government control. Pls.' Cmts. at 9, 12. Commerce, though, has never found such a precondition within the statute. Remand Results at 4 ("[T]he statute does not require the existence of an individually examined rate for a rate to be assigned to the sample pool."). Commerce explained that, consistent with 19 U.S.C. § 1673d(c)(5), it will normally base its sample pool rate on the margins "established for exporters and producers individually examined, excluding de minimis margins or margins based entirely on [adverse facts available]," and that, because in this case it assigned the China-wide entity it investigated a dumping margin based entirely on adverse facts available, it would use another reasonable calculation method for Jiuli. Remand Results at 4. Commerce also explained that it determined both that the China-wide entity's rate was not reasonably reflective of Jiuli's dumping rates and that it was inappropriate to assign a cooperative respondent like Jiuli an antidumping margin based entirely on adverse facts available due to another respondent's failure to cooperate. Id. at 4, 6, 15. These are reasonable conclusions.

Commerce's chosen methodology of applying an average of the initiation margins is also consistent with what Commerce has done in other NME investigations in which the individually investigated rates are based entirely on adverse facts available,

and with what Commerce has done in market economy proceedings in which the individually investigated rates are zero, de minimis, or based entirely on adverse facts available. See Sodium Hexametaphosphate, 73 Fed. Reg. 6479 (assigning average of the initiation margins as sample pool rate); Glycine from Japan, 72 Fed. Reg. 67,271 (Dep't of Commerce Nov. 28, 2007) (calculating all-others rate based upon average of the petition rates); Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products From Argentina, Japan, and Thailand, 65 Fed. Reg. 5,520 (Dep't of Commerce Feb. 4, 2000) (same); Stainless Steel Plate in Coils from Canada, 64 Fed. Reg. 15,457 (Dep't of Commerce Mar. 31, 1999) (same).

Finally, in the Remand Results Commerce addressed Plaintiffs' arguments that Commerce should have used the "expected methodology" specified in the Statement of Administrative Action. Remand Results at 5-6, 15-16. The expected methodology is a calculation in which Commerce "weight-average[s] the zero and de minimis margins and the margins determined pursuant to the facts available." The Uruguay Round Agreements Act, Statement of Administration Action ("SAA"), H.R. Doc. No. 103-826(I), at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201. Commerce explained: "given that, in this case, there are no zero or de minimis margins on the record of this proceeding, calculating Jiuli's margin according to the expected methodology is not applicable." Remand Results at 5. Commerce further explained that the SAA expressly states that if Commerce determines the expected methodology "'would not be reasonably reflective of potential dumping margins for non-investigated exporters and

producers'" it has discretion to "'use other reasonable methods'" in calculating the rate for these companies.  Id. at 6 (quoting SAA).

Here, as discussed above, Commerce made that determination.  It found that the China-wide entity's adverse facts available rate was not reasonably reflective of potential dumping margins for Jiuli because the adverse facts available rate was higher than the adjusted petition rates upon which Commerce initiated the investigation, and that it would be unreasonable to apply the adverse facts available rate to Jiuli as a result of Commerce's administrative resource constraints.  Remand Results at 6.  Given the available margins in the record, Commerce reasonably assigned Jiuli a rate based upon an average of the petition rates, and corroborated the rate to the extent practicable using the mandatory respondent's unverified data, which was the only other data in the record.

## CONCLUSION

Commerce's Remand Results are supported by substantial evidence, and otherwise in accordance with law.  Accordingly, the court will sustain Commerce's Remand Results and enter judgment for the United States.

    /s/ Leo M. Gordon    
Judge Leo M. Gordon

Dated:    April 20, 2010
           New York, New York