Slip Op. 13-22

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORPORATION and OCCIDENTAL CHEMICAL CORPORATION, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Before: Richard K. Eaton, Judge |
| UNITED STATES, | : : | Court No. 08-00364 |
| Defendant, | : : | |
| and | : : | |
| ARCH CHEMICALS, INC., | : : | |
| Defendant-Intervenor. | : : | |

## OPINION

[The Department of Commerce's Final Results of Redetermination are sustained.]

Dated: February 20, 2013

*Gibson, Dunn & Crutcher, LLP* (*John C. Wood* and *Daniel J. Plaine*), for plaintiffs.

*Stuart F. Delery*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David F. D'Alessandris*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*David Richardson*), of counsel, for defendant.

*Law Offices of Peggy A. Clarke* (*Peggy A. Clarke*), for defendant-intervenor.

Eaton, Judge:  Before the court are the Final Results of Redetermination, pursuant to a remand order issued by the court on November 18, 2011, involving the Final Results and

Amended Final Results of the Second Administrative Review of the antidumping duty order on chlorinated isocyanurates[1] ("isos") from the People's Republic of China ("PRC"). *See* Final Results of Redetermination (Dep't of Commerce Mar. 19, 2012) (ECF Dkt. No. 79) ("Remand Results"); *Clearon Corp. v. United States*, 35 CIT __, Slip Op. 11-142 (Nov. 18, 2011) ("*Clearon II*")[2]; *see also* Chlorinated Isos from the PRC, 73 Fed. Reg. 52,645 (Dep't of Commerce Sept. 10, 2008) (final results of antidumping administrative review); Chlorinated Isos from the PRC, 73 Fed. Reg. 62,249 (Dep't of Commerce Oct. 20, 2008) (amended final results of antidumping administrative review) (collectively, "Final Results").

By the remand order, the Department of Commerce ("Commerce" or "the Department") was directed to reexamine its selection of surrogate data to value the factors of production of respondents Hebei Jiheng Chemical Corporation, Ltd. ("Jiheng") and Nanning Chemical Industry Co. Ltd. ("Nanning"), including the Indian surrogate data used to value urea and steam coal, and to reconsider and explain its selection of anhydrous ammonia to value an ammonia gas by-product offset credit for Jiheng. *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 30–31.

In the Remand Results, Commerce continues to find that it used the best available information to value the factors of production and Jiheng's by-product offset, and that its conclusions are supported by substantial evidence. Remand Results at 2.

For the reasons set forth below, the Remand Results are sustained.

---

[1]    "Chlorinated isocyanurates are derivatives of cyanuric acid, described as chlorinated s-triazine triones. . . . [They are] available in powder, granular, and tableted forms." *Arch Chems., Inc. v. United States*, 33 CIT __, __, Slip Op. 09-00071, at 3 n.1 (July 13, 2009) (not reported in the Federal Supplement) (internal quotation marks and citation omitted).

[2]    In *Clearon I*, the court denied Commerce's December 14, 2009 motion to dismiss certain counts in plaintiffs' Complaint. *Clearon Corp. v. United States*, 34 CIT __, 717 F. Supp. 2d 1366 (2010) ("*Clearon I*").

## BACKGROUND

In late 2008, Commerce issued the Amended Final Results of the Second Administrative Review of the antidumping duty order on chlorinated isocyanurates from the PRC, in which Commerce assigned dumping margins to respondents Jiheng and Nanning of 0.90% and 54.86%, respectively. *See* Final Results, 73 Fed. Reg. at 62,250. The Final Results cover the period of review ("POR") June 1, 2006 through May 31, 2007, and incorporate by reference the Department's Issues and Decision Memorandum. *See* Issues & Decision Mem. for the 2006–2007 Admin. Review of Isos from the PRC (Dep't of Commerce Sept. 5, 2008) ("Issues & Dec. Mem.").

On April 17, 2009, plaintiffs Clearon Corporation and Occidental Chemical Corporation, domestic producers of isos, filed a motion for judgment on the agency record pursuant to USCIT Rule 56.2. *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 2. Plaintiffs' motion challenged Commerce's (1) selection of surrogate values for urea; (2) selection of surrogate values for steam coal; and (3) valuation of Jiheng's waste ammonia gas by-product credit. On December 14, 2009, Commerce filed a motion to dismiss certain counts in plaintiffs' Complaint. The court denied defendant's motion in *Clearon I. Clearon Corp. v. United States*, 34 CIT __, 717 F. Supp. 2d 1366 (2010) ("*Clearon I*"). Plaintiffs' 56.2 motion was granted, in part, in *Clearon II* and the case was remanded to Commerce on November 18, 2011.

In its March 19, 2012 Remand Results, Commerce has again determined that: "(1) the Indian import data are the best available information on the record for valuing urea; (2) the Tata Energy Research Institute ("TERI") data are the best available information on the record for valuing steam coal; and (3) the World Trade Atlas ("WTA") data for anhydrous ammonia are the

best available information on the record for valuing Jiheng's ammonia gas by-product." Remand Results at 2.

Plaintiffs dispute each of these determinations. Comments of Clearon Corp. & Occidental Chem. Corp. Regarding Final Results of Redetermination 2, 8, 12 (May 3, 2012) (ECF Dkt. No. 90) ("Pls.' Cmts."). Defendant, the United States, contends that the Remand Results are consistent with the court's instructions, are supported by substantial evidence, and should be sustained. Def.'s Resp. to Pls.' Comments 1 (May 25, 2012) (ECF Dkt. No. 96) ("Def.'s Resp."). Defendant-Intervenor, Arch Chemicals, likewise contends that the Remand Results should be sustained. Resp. of Arch Chems. to Clearon Corp. & Occidental Chemical Corp.'s Comments 8 (May 25, 2012) (ECF Dkt. No. 94) ("Def.-Int.'s Resp.").

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

## DISCUSSION

I.    **Legal Framework**

The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value.[3] When determining whether the subject merchandise is being, or is likely to be, sold at less-than-fair value, 19 U.S.C. § 1677b(a) requires Commerce to make "a fair

---

[3]    "If the price of a good in the home market ('normal value') is higher than the price for the same good in the United States ('export price'), then the comparison produces a positive number that indicates that dumping has occurred, and the magnitude of the number determines the dumping margin." *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 5.

comparison . . . between the export price[4] or constructed export price[5] and normal value." 19

U.S.C. § 1677b(a). "Commerce ordinarily determines the normal value of subject merchandise

of an exporter or producer from a non-market economy . . . country[6] 'on the basis of the value

of the factors of production utilized in producing the merchandise.'" *Shantou Red Garden*

*Foodstuff Co. v. United States*, 36 CIT __, __, 815 F. Supp. 2d 1311, 1316 (2012) (quoting 19

U.S.C. § 1677b(c)(1)). In doing so, Commerce seeks "to assess the 'price or costs' of factors of

production" of subject merchandise in a comparable market economy[7] "in an attempt to

construct a hypothetical market value of that product" in the nonmarket economy. *Nation Ford*

*Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999). The statute directs

Commerce to value the factors of production "based on the best available information regarding

the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1).

---

[4]     The "export price" is "the price at which the subject merchandise is first sold . . . by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted." 19 U.S.C. § 1677a(a).

[5]     The "constructed export price" is "the price at which the subject merchandise is first sold . . . in the United States . . . by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted." 19 U.S.C. § 1677a(b).

[6]     A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because it deems China to be a nonmarket economy country, Commerce generally considers information on sales in China and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).

[7]     Section 1677b(c)(4)(A) requires that Commerce "in valuing factors of production . . . shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country."

## II.     Commerce's Choice of a Surrogate Value for Urea

### A.     *Urea Used in Agriculture Versus Chemical Production*

The Department's Final Results valued the urea input using Indian World Trade Atlas

("WTA") import data, which included data for Omani-sourced imports of urea into India. In

doing so, the Department rejected the use of prices for urea sold in the Philippines after finding

the "domestic Philippine prices for urea not to be the best available information . . . because

these prices were for urea used as fertilizer and sold in 50-kg bags which were not product

specific to the urea used by respondents in this review." Issues & Dec. Mem. at 8.

In *Clearon II*, the court directed Commerce to "reexamine its determination with respect

to (1) whether urea used for agricultural purposes can be differentiated from urea used for

chemical production, and (2) any reason urea sold in fifty kilogram bags cannot be the source of

a surrogate price in this case." *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 30.

Upon reexamination on remand, the Department has now "determined that the record

evidence supports finding that urea used for agricultural purposes should *not* be differentiated

from urea used for industrial purposes." Remand Results at 4 (emphasis added). In addition,

while the Department found that information on the record "supports the proposition that urea

has multiple uses," it did not indicate "that there are two separate and distinct markets." Remand

Results at 5.

As to the court's direction to Commerce to reexamine whether urea sold in fifty kilogram

bags could be the source of a surrogate price in this case, on remand the Department found that

"the record does not contain any evidence that there are any differences in the physical

characteristics, packaging of, and channels of trade/selling functions for urea sold for different

uses to support a finding that there are two distinct markets for urea used for agricultural versus

industrial applications." Remand Results at 5. Hence, Commerce has now determined that its previous assertion that "the Philippine data were not specific to the type of urea used by the respondents . . . [was] not supported by record evidence." Remand Results at 5. Indeed, on remand, the Department has found that "one of the two respondents in this administrative review purchased urea in similar quantities [to the fifty kilogram bags]." Remand Results at 5. Therefore, Commerce has now concluded that neither market segmentation nor that the Philippine urea was sold in fifty-kilogram bags presents an obstacle to the use of Philippine prices as surrogate values.

Nonetheless, as discussed below, "[a]fter reviewing the record, the Department continues to find that the Indian data constitute the best available information on the record for valuing urea." Remand Results at 6.

### B.    *Evaluation of Philippine Data and Comparison to Indian Data*

In addition to directing Commerce to reexamine the manner in which Philippine urea was sold, the court further directed Commerce to "[1] fully analyze the evidence presented by both sides in reviewing its decision to exclude the Philippine data, [2] further examine the Philippine data using the same criteria it employed in selecting the Indian data, [3] provide a complete comparison of the two data sets, and [4] adequately explain how it has come to its final determination." *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 30–31.

According to Commerce, when valuing the factors of production pursuant to 19 U.S.C. § 1677b(c)(1), "the Department's stated practice [is] to choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy." Remand Results at 6–7. Using these criteria,

Commerce reexamined the Philippine dataset and compared it to the Indian WTA data. In doing so, Commerce found that the Philippine dataset, like the Indian dataset, fulfilled its selection criteria, i.e., it represented a broad market-average; was specific to the urea input; was exclusive of taxes; was contemporaneous with the POR; and was publicly available. Remand Results at 7–8. The Department further found that, although the Philippine retail average unit value was the highest value on the record, it was not aberrational when compared to other potential surrogate countries, but "[r]ather it constitutes the high end of a range of values." Remand Results at 8. This being the case, Commerce found that "both sources of data could potentially be used in valuing the input for urea." Remand Results at 16.

The Department, however, continues to argue for its use of the Indian data based on its regulations. Pursuant to 19 C.F.R. 351.408(c)(2), the Department "normally will value all factors in a single surrogate country." 19 C.F.R. 351.408(c)(2) (2007). For Commerce, this regulation provides a sufficient basis for the use of data from India. Remand Results at 16–17; Def.'s Resp. 3 ("Commerce will only introduce data from a secondary surrogate country into the calculation if there were no primary surrogate value, or if the primary surrogate value was not reliable based on record evidence.").

Here, "India is the primary surrogate country, where the surrogate values, contingent upon availability, were obtained for the [other factors of production]. Accordingly, the Department's first preference in selecting surrogate value data . . . is publicly available Indian data for the POR, where there is no evidence to show that the data are aberrational or otherwise unreliable." Remand Results at 17; *see also* Def.'s Resp. 2 ("[B]ecause Commerce had selected India as the primary surrogate country—a decision that has not been challenged in this litigation—Commerce appropriately selected the Indian data as a surrogate value for urea as the

best available information in preference to the Philippine data."). Therefore, based on its regulation, Commerce concluded that "despite the fact that the Department reversed its decision that the Philippine retail pricing data were not specific to the input of urea being used in the production of the subject merchandise, the record evidence . . . still supports a determination that the Indian import data meet the Department's criteria for best available information." Remand Results at 17.

In disputing this decision, plaintiffs insist that the Department's use of the "single surrogate country" criteria as the tiebreaker was overly simplistic. Pls.' Cmts. 3. Plaintiffs claim that "[t]he Department's task is not to select *any* data from its primary surrogate country that meets certain minimum indicia of reliability; it is rather to select the data that are the '*best available*' on the record." Pls.' Cmts. 3. Plaintiffs rely on this Court's opinion in *Dorbest, Ltd. v. United States* for the proposition that the "'best' choice is ascertained by examining and comparing the advantages and disadvantages of using certain data as opposed to other data." *Dorbest, Ltd. v. United States*, 30 CIT 1671, 1675, 462 F. Supp. 2d 1262, 1268 (2006).

Plaintiffs further argue that Commerce "fail[ed] to make the 'complete comparison of the two data sets' required by the Court's remand instructions," and failed "adequately [to] explain how it has come to its final determination." Pls.' Cmts. 2. In other words, while conceding that the Department fully examined the Philippine data using the same criteria it employed in selecting the Indian data, plaintiffs argue that Commerce failed to actually compare the Philippine dataset to the Indian data. In plaintiffs view, "it is plain that the only 'comparison' that the Department performed of the Indian and Philippine urea price data was to a set of minimum reliability criteria." Pls.' Cmts. 3. To plaintiffs, this "exercise may *lay the groundwork* for a comparison, by confirming that both data sets are usable, but certainly does not

constitute the 'complete comparison of the two data sets' that was required by this Court's remand decision." Pls.' Cmts. 3. Plaintiffs continue that "[h]ad the Department conducted the required comparative assessment, there are several relevant differences between the Indian and Philippine urea price data that would have been pertinent to a determination of the 'best available information.'" Pls.' Cmts. 4. The differences identified by plaintiffs are (1) "the Philippine data reflects domestic sales rather than import transactions," (2) "the greater specificity of the Philippine data [which] is specific to urea sold in 50-kilogram bags," and (3) "the very different structure of the Indian and Philippine urea markets." Pls.' Cmts. 5–6.

Commerce defends its "single surrogate country" preference by explaining that "[u]sing reliable data from the primary surrogate is preferred to using data from the secondary surrogate because mixing in values from a secondary surrogate country adds a distortion into the calculations." Def.'s Resp. 2–3; Def.'s Resp. 7 ("[U]nnecessary distortion [is] caused by mixing in values from other countries when reliable primary surrogate data is available."). According to Commerce, "there are sound and reasonable economic reasons for Commerce to select, to the extent there is reliable data in the primary surrogate, all of the surrogate values from the primary surrogate country. These economic reasons render information from secondary surrogate countries not the best available information, and thus not appropriate for valuing the factors of production." Def.'s Resp. 2.

Specifically, in selecting surrogate values,

Commerce is attempting to determine what an Indian producer would pay for the factors of production. The Indian producer would pay prices available in India or for imports into India. An Indian producer generally has access only to prices in its own country (India) and would not have access to prices in secondary surrogate countries, such as the Philippines. Therefore, resorting to secondary surrogate country data to obtain a factor value actually undermines and makes less accurate Commerce's determination of what an Indian producer would pay for factors used to produce the subject merchandise.

Def.'s Resp. 3. Therefore, "Commerce only resorts to secondary surrogate country values if the record does not contain any value for a factor from the primary surrogate, or if the primary surrogate country values upon the record are determined, based on record evidence, to be aberrational or unreliable." Def.'s Resp. 3–4.

Commerce further asserts that it is not required to compare "the primary surrogate country value with a secondary surrogate country value to see which one is 'better.'" Def.'s Resp. 4. In other words, Commerce insists that it is not required to "search for the 'best available' information across surrogate countries." Def.'s Resp. 5; *see also* Remand Results at 29 ("In the instant review, where we have reliable surrogate value data from the primary surrogate country, we determined that the use of reliable surrogate value information from the primary surrogate country is the best available information when the alternative is information obtained from a secondary surrogate country."); Def.-Int.'s Resp. 2–3 ("The problem with Plaintiffs' argument is that all other things are not equal: one source is from the primary surrogate country and one is not.").

With respect to plaintiffs' claimed difference between the domestic sales prices from the Philippines and the import prices from India (and the related difference between the structures of the Indian and Philippine domestic urea markets), Commerce counters that plaintiffs' argument is misleading because the Department found "no evidence that the Indian import value of urea is distorted by virtue of any government involvement in the import, movement or resale of urea in India." Remand Results at 30. According to Commerce, plaintiffs "ha[ve] pointed to no new evidence that would lead us to reconsider the issue." Remand Results at 31; *see also* Def.-Int.'s Resp. 4 ("With respect to the Indian government's involvement in urea pricing within India— that is not relevant to pricing at the border."). Put another way, Commerce argues that while the

Indian government may play a role in domestic urea pricing, and therefore the structure of the domestic urea market in India may differ from that of the Philippines, there is no evidence on the record that this role extends to import pricing.

In addressing plaintiffs' reference to the "greater specificity of the Philippine data," the Department counters that "any attempt to say that the Department established that the 50-kg bags are specific to purchases made in this review is misleading. The fact is that, while the record shows one respondent purchased urea in quantities similar to 50-kg bags, the record also shows that the other respondent's urea purchases were measured in [a] much larger unit of measure than [kilograms]." Remand Results at 30.

As to plaintiffs' argument that the Indian and Philippine urea markets are sufficiently different as to require the use of the Philippine data, this claim also relates to plaintiffs' assertion that the Indian government is involved in the domestic urea market. In addressing this argument, Commerce again points out that the value it used for urea was the import price, and that there is no record evidence of government involvement in the import market for urea. Remand Results at 30–31; *see also* Def.-Int.'s Resp. 4.

The court holds that Commerce's decision to use the Indian data was supported by substantial evidence. First, the preference for the use of a "single surrogate country" is directed by regulation. 19 C.F.R. § 351.408(c)(2) ("[Commerce] normally will value all factors in a single surrogate country."). Thus, the court must treat seriously the Department's preference for the use of a single surrogate country. *See, e.g., Royal Thai Gov't v. United States*, 436 F.3d 1330, 1340 (Fed. Cir. 2006) (deferring to Commerce's interpretation of its own regulation); *Cathedral Candle Co. v. United States ITC*, 400 F.3d 1352, 1363 (Fed. Cir. 2005) ("[I]t is well

settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts.").

Second, the preference is also reasonable because, as Commerce points out, deriving the surrogate data from one surrogate country limits the amount of distortion introduced into its calculations because a domestic producer would be more likely to purchase a product available in India. As the court pointed out in *Peer Bearing*, "the preference for use of data from a single surrogate country could support a choice of data as the best available information where the other available data 'upon a fair comparison, are otherwise seen to be fairly equal.'" *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, 804 F. Supp. 2d 1337, 1353 (2011) (citation omitted); *see also Fuwei Films (Shandong) Co. v. United States*, 36 CIT __, __, 837 F. Supp. 2d 1347, 1356 (2012) ("Commerce's preference for using data from a single country [is] unreasonable when the data was demonstrably aberrational as compared to certain benchmark prices, and alternative data sources could be better corroborated.") (citation omitted); *Bristol Metals L.P. v. United States*, 34 CIT __, __, 703 F. Supp. 2d 1370, 1374 (2010) ("Commerce's regulations provide that surrogate values should normally be 'publicly available' and . . . from a single surrogate country." (citing 19 C.F.R. § 351.408(c)). Thus, the use of a "single surrogate country" is justified when, as here, all other factors are "fairly equal" because minimizing distortion supports a finding that Commerce relied upon the best available information on the record.

Third, plaintiffs' reliance on *Dorbest* does not help their argument. In *Dorbest*, this Court stated that when "Commerce is faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information," so long as the Department provides a reasonable explanation. *Dorbest*, 30 CIT at

1687, 462 F. Supp. 2d at 1277; *see also Trust Chem Co. v. United States*, 35 CIT __, __, 791 F. Supp. 2d 1257, 1263 (2011). As defendant indicates, "[n]owhere in [*Dorbest*] . . . did the Court require Commerce to compare values between surrogate countries when there is a reliable value from the primary surrogate country. Indeed, [in *Dorbest*] the Court specifically upheld Commerce's decision not to use three Indonesian financial statements because there were adequate financial statements from the primary surrogate country, India, on the record." Def.'s Resp. 5 (citing *Dorbest*, 462 F. Supp. 2d at 1307–08).

With respect to plaintiffs' argument that a determination based on the "best available information" requires that Commerce make a more complete comparison of the datasets, it is clear that here, the Department, after establishing that the information from each country was reliable and not aberrational, went on to address the three specific areas for comparison urged by plaintiffs. As such, Commerce did not merely rely on its preference for using data from a single surrogate country in reaching its determination, but performed the comparison that plaintiffs insist is required by the "best available information" standard and by the court's remand instructions.

As to the first difference that plaintiffs claim would have emerged from a proper comparison, the court is not convinced. The plaintiffs have not adequately supported their argument that, because the Philippine dataset reflects domestic sales rather than import transactions, it should be preferred over the Indian data. As defendant points out, "[w]hile the Indian government may control the domestic market for urea, there is no evidence that the Indian government has any control over the price at which other market-economy countries sell urea to India." Def.'s Resp. 7–8. In fact, the record is silent as to the question of whether or not the Indian government had any control over the prices at which third country market economy

countries sold urea into the Indian market. Therefore, this claimed difference cannot be said to undermine the reliability of the Indian data because there is no record evidence that import prices of urea are not market-driven. In addition, plaintiffs have cited no evidence that a domestic Indian producer would prefer domestic rather than imported urea.

Plaintiffs also argue for the greater specificity of the Philippine data because it was for urea sold in fifty-kilogram bags. Pls.' Cmts. 4–5 ("Another potentially significant difference between the Philippine and Indian urea price data is the greater specificity of the Philippine data. The Philippine data is specific to urea sold in 50-kilogram bags."). This argument, however, results from a clear misreading of the Remand Results. While Commerce did identify one respondent that purchased urea in quantities similar to fifty-kilogram bags, "the other respondent's urea purchases were measured in [a] much larger unit of measure than [kilograms]." Remand Results at 30. Therefore, plaintiffs' "greater specificity" argument cannot be credited because the Philippine data is not necessarily more specific to the production of the isos at issue here.

Finally, plaintiffs point to the different market structures of India and the Philippines as an important difference between the two datasets. Pls.' Cmts. 5–6 ("[Another] potentially relevant consideration, had the Department conducted the required comparison of the data sets, involves the very different structure of the Indian and Philippine urea markets. The record establishes that only three State Trading Enterprises are authorized by the Indian government to import urea, and such imports are based on the Government of India's assessment of the 'requirements of urea imports' for the country.[8] . . . Conversely, there is no record evidence of

---

[8]        In support of this argument, plaintiffs point to a print-out of the Indian Department of Fertilizer's Website, which plaintiffs submitted to Commerce during the underlying review as part of their rebuttal comments on the surrogate values for the factors of

any governmental involvement whatsoever in the Philippine urea market."). This issue overlaps

with plaintiffs' argument, discussed above, that the Indian dataset reflects import prices, while

the Philippine dataset reflects domestic market prices. *See* Pls.' Cmts. 5–6. As noted above,

however, this perceived difference between the market structures of India and the Philippines

does not undermine the results of Commerce's comparison. While it is, in fact, the case that

three domestic Indian companies are authorized to contract for all of the country's urea imports

based on the government's assessment of need, there is no indication that the price of the urea is

set by other than market forces. Indeed, Commerce examined the record and found "no evidence

that the Indian import value of urea is distorted by virtue of any government involvement in the

import, movement or resale of urea [with]in India." Remand Results at 30; *see also* Def.-Int.'s

Resp. 4 ("With respect to the Indian government's involvement in urea pricing within India—

that is not relevant to pricing at the border."). Plaintiffs have produced no evidence that would

undermine this conclusion. That is, although plaintiffs find the government of India's

involvement in the volume of urea imports significant, they placed no evidence on the record

demonstrating that this involvement distorted the price of imports into India. The conclusion

that the urea surrogate value was not distorted by government involvement is further bolstered by

this court's consideration of the facts in *Arch Chemicals*. *Arch Chems., Inc. v. United States*, 33

CIT __, __, Slip Op. 09-00071, at 30 (July 13, 2009) (not reported in the Federal Supplement)

---

production. According to the Department of Fertilizer's Website, "[t]he requirement of urea imports is assessed by [the Government of India] in relation to the estimated demand, indigenous production, availability of stocks and pipeline requirement." App. in Supp. of Pls.' Cmts. Tab 1, Ex. 12, at 1 (May 3, 2012) (ECF. Dkt. No. 91) (Pls.' App."). Then, based on the Indian Government's estimate of necessary imports, the Department of Fertilizer authorizes three agencies to arrange for imports of urea: (1) MMTC Ltd., (2) Indian Potash Limited, and (3) the State Trading Corporation. Pls.' App. Tab 1, Ex. 12, at 1. In doing so, "[l]ong term contracting with producers is permitted with a view to ensure security of supplies at the internationally competitive prices most advantageous to the country." Pls.' App. Tab 1, Ex. 12, at 2.

(finding that there was no evidence that data was "tainted by reason of government involvement").

Thus, Commerce properly relied on the preference for single country data found in its regulation when finding a surrogate value for urea. In addition, the court finds that Commerce properly followed the court's remand instructions by evaluating the Philippine dataset and comparing it to the Indian dataset before concluding that the Indian data remained the best available information on the record. Because Commerce actually performed this analysis, the court reaches no conclusion as to whether the comparison is required by the statute. Therefore, based on the foregoing, the court sustains the Department's use of the Indian WTA data to value the urea input.

### C.    *Omani Data Included in the Urea Price Data from India*

The court also directed Commerce to "revisit its determination with respect to the Omani prices [that were included in the Indian WTA data used to value the urea input], fully analyze the evidence regarding the Omani data, and fully explain and support with substantial evidence its determination of whether or not to include the Omani data in the WTA data." *Clearon II*, 35 CIT at __, Slip Op. 11-142, at 31. The purpose of this direction was to address plaintiffs' complaint that the Omani prices were aberrationally low, making the WTA data as a whole aberrationally low. Pls.' Cmts. 7 ("[T]he Omani imports were the lowest-valued imports of any country into India, and the next-lowest source of imports (from Liberia) was 46% higher than the Omani value.").

In response, Commerce "reexamined the information on the record . . . and determined that the Omani data was properly included in the Indian WTA data in calculating a surrogate value for urea." Remand Results at 11. The Department asserts that, in accordance with its

practice, it first "compared the aggregate Indian import [average unit value] of urea ($0.23 per kg) with [the prices for urea from] other potential surrogate countries (Indonesia ($0.14 per kg), Sri Lanka ($0.29 per kg), and the Philippines ($0.22 per kg)) and found that the Indian import value is within the range of values for those countries." Remand Results at 12. Thus, the Indian value, which included prices of urea imported into India from other countries including from Oman, was lower than the values for some potential surrogate countries, but higher than the values from others. For this reason, the Department did not find the Indian value to be aberrational.

Going beyond its usual practice, Commerce then "applied an additional test comparing the value of Indian imports from Oman with other record information, whereby it found that the [average unit value] for Indian imports of urea from Oman ($0.18 per kg) are higher than the Indonesian import [average unit value] ($0.14 per kg) and the [average unit value] for several countries in the Philippine import data ($0.13 per kg to $0.16 per kg)." Remand Results at 12; Remand Results at 14–15 ("[T]he Department took the additional steps to compare the Indian import value of urea from Oman to the [average unit value] for several countries in the Philippine and Indonesian import data and found that the Omani value is, in fact, higher than the import values of urea for other potential surrogate countries. Accordingly, as a result of this additional test, the Department found based on record evidence that the Omani urea price fell within the range of urea prices from other potential surrogate countries, and that this was additional support for finding that there was no record evidence that the Indian import value of urea from Oman is distorted or aberrational."); *see also* Def.'s Resp. 9 ("[T]he Omani data fell within the range of the import values from individual market economy countries into the other potential surrogate countries.").

Next, the Department looked at the range of values for urea imported into India and found that while

> the Omani price is the lowest unit value among Indian imports, we do not find the Omani value to be outside the range of unit values. As with any range of data, there is by necessity a low end and a high end of the range. While the Omani value is 30 percent lower than the average, the value of German imports of urea into India is approximately 50 percent higher than the average. Accordingly, we do not find the Omani import value, as a low end of the range, or the German import value, as the high end of the range, to be an outlier. . . . In other words, because the low value (Oman) and the high value (Germany) are both somewhat removed from the average, we don't find either to be an anomaly, but merely the low and high ends of a broad spectrum of values of Indian imports of urea.

Remand Results at 15. For these reasons, Commerce stated that it "continues to find that the Omani price is not distorted or aberrational because it is within a range of values of Indian imports, albeit at the low end of the range, and is within the range of import prices of urea of other potential surrogate countries." Remand Results at 15.

Plaintiffs renew their objection to the inclusion of the Omani values within the Indian WTA dataset because Commerce "has not explained the basis for its finding that the Omani and German imports represent the 'low and high ends of a broad spectrum of values.'"[9] Pls.' Cmts.

---

[9]     Defendant also points to the court's finding in *Clearon II* that "there does not appear to be any evidence on the record that demonstrates how India's long-term contract with Oman tainted the sale prices of urea." *Clearon II*, 35 CIT at __, Slip Op. 11-142 at 19. Here, this continues to be true because there is no evidence on the record that suggests price distortions resulting from the long-term contract.

Similarly, in *Arch Chemicals*, a case involving the prior first administrative review of the antidumping duty order on isos from the PRC, the court rejected "the same argument with respect to the Government of India's control of the urea imports and market in India in an attempt to exclude Indian imports of urea from Oman." Remand Results at 10–11. In doing so, the court stated that it was

> unconvinced that Commerce erred by not excluding the [Omani] data as tainted by reason of government involvement. Oman and India are market economy countries and there is no evidence that, at the time the contract was entered into, the prices set were not market-driven. In addition, Commerce could reasonably

7. "To the contrary, the data appear more consistent with a range of imports within a relatively narrow band, with Oman and Germany as the clear outlier data points." Pls.' Cmts. 7–8.

The court finds that Commerce has supported with substantial evidence its decision to include the Omani data in the Indian WTA dataset when determining the surrogate value for urea. As an initial matter, it is worth noting that had Commerce relied solely on its argument that the low Omani value and the high German value demonstrated that the Omani value fell within an acceptable range, this issue would have been remanded. The Department's argument that these two values somehow validate each other is neither adequately explained nor convincingly self-evident. The Department, however, did not rely on this analysis alone.

First, Commerce compared the aggregate Indian import average unit value of urea to other potential surrogate datasets on the record (i.e., prices for urea imported into countries other than India), which demonstrated that it was not aberrational because it was higher than some potential surrogate datasets, but lower than others. Second, Commerce examined the Omani value on its own by comparing it to prices of other potential surrogate values on the record. In doing so, the Department showed that the Omani value was not aberrational, even though it was the lowest value within the Indian import dataset, because it was higher than other potential surrogate values, including the Indonesian import average unit value and the average unit value for several countries in the Philippine import data. Thus, it is apparent that the Indian import

---

find that, the mere fact that a product is sold to a single purchaser pursuant to a long-term contract, does not necessarily make the price anomalous. Further, there was no record evidence demonstrating that urea sales made subject to the contract were distorted.

*Arch Chems.*, 35 CIT at ___ Slip Op. 09-00071, at 29–30. Defendant claims that "[w]hile the facts in *Arch Chemicals* and the instant administrative review may be different with respect to the Indian import data of urea from Oman, we find in this redetermination that this record also does not contain any information to indicate that the Oman value is distorted or aberrational." Remand Results at 13.

dataset as a whole fell within the range of urea prices from other potential surrogate countries. Furthermore, while the Omani data itself was at the low end of the range of all potential surrogate values on this record, it was not the lowest value, nor was it the lowest when compared to some countries within the Philippine import dataset.

Additionally, defendant is correct in noting that the Omani data was averaged with other Indian import data, serving to mitigate any distortion that the low figure may have introduced. Def.'s Resp. 6 ("[T]he Indian WTA data for urea represent broad-market average non-export prices, because the average value of the urea is based upon import prices compiled from a broad range of market-economy countries."). Thus, despite plaintiffs' argument, it appears that the Department's conclusion that the Omani data was not aberrational was supported by substantial evidence.

## III.     Commerce's Choice of a Surrogate Value for Steam Coal

In its Final Results, Commerce valued the steam coal input using prices from the TERI Data Directory and Yearbook, which reports steam coal prices from the Indian market. Remand Results at 18. In *Clearon II*, the court directed Commerce to "revisit its determination with respect to its surrogate valuation of steam coal, and fully analyze the use of the TERI data, including whether the chemical industry would be considered a core sector industry, and whether the use of this data is supported by substantial evidence." *Clearon II*, 35 CIT at __, Slip Op. 11-142 at 31. Whether India's chemical industry is a core sector industry might have a bearing on whether a manufacturer of isos could purchase steam coal at the price contained in the TERI data.

In response, Commerce "reopened the record . . . and requested that interested parties submit new information pertaining to the valuation of steam coal." Remand Results at 19.

Specifically, Commerce sought "information on whether the chemical industry is a part of the core sector industry and, thus, received TERI prices which are lower than prices offered by [Coal India] to non-core industries." Remand Results at 19.

The Department received new information from plaintiffs and Jiheng, including Coal India's list of core sector customers. Following examination of this information, Commerce "continue[d] to find that TERI prices are the best available information for valuing Jiheng's steam coal." Remand Results at 20. In particular, Commerce found that "[w]hile the record does not list the chemical industry as a 'core industry' *per se*, evidence collected after reopening the record indicates that numerous chemical companies are listed by [Coal India] as part of the core sector." Remand Results at 20.

Plaintiffs contend that the Department "ignores directly relevant evidence showing that chemicals is *not* among the core industry customers of Coal India . . . and that the [Department's] findings are manifestly not supported by substantial evidence." Pls.' Cmts. 8. Specifically, plaintiffs challenge the Department's reading of the Coal India List because "the vast majority of chemical companies listed in the [Coal India] customer list are identified as non-core sector customers, not core sector customers." Pls.' Cmts. 9. Under plaintiffs' reading of the list, "the chemical companies listed as 'core sector' customers . . . are so identified because they have Captive Power Plants; those companies that simply produce chemicals and do not undertake other 'core sector' operations are all listed as 'non-core' customers." Pls.' Cmts. 9–10; *see also* Pls.' Cmts. 11 ("[T]he only chemical companies that are listed as Core Sector customers are so listed not because of their chemical producing operations—which should be the focus of the Department's inquiry—but because they qualify based on other, unrelated operations such as running a Captive Power Plant.").

Responding to these assertions, Commerce states that while plaintiffs "claim that all five companies with the word 'chemical' in them are being listed as core sector customers only because they have captive power plants, . . . [a] careful examination of the same information reveals that chemical companies which do not maintain captive power plants are also classified as core sector customers." Remand Results at 34; *see also* Remand Results at 21 (The list on the record "refers to additional chemical companies as core customers without referring to them as captive power producers."). In particular, Commerce identified "Tr Chemicals Pvt., Ltd." as a chemical company without a captive power plant that was listed as a core sector customer. Remand Results at 34. In addition, Coal India's list of core sector customers included Kanoria Chemical Industries, Ltd., which produces chemicals and fertilizers. Remand Results at 20. To Commerce, "Kanoria's experience as a core consumer of steam coal supports the finding that producers of chlorinated isocyanurates and fertilizers [and other chemicals] are, *de facto*, treated as core industries in India." Remand Results at 20. For this reason, the Department insists that "while the definition of the core sector industries is unclear, chemical companies enjoy the access to TERI prices." Remand Results at 34.

Finally, plaintiffs argue that the Department "fail[ed] to discuss—or even acknowledge the record evidence directly contradicting the Department's findings with respect to steam coal valuation," including three specific items: (1) the 2006–2007 Ministry of Coal annual report, (2) the Indian Supreme Court decision, and (3) the annual reports. Pls.' Cmts. 11–12.

As to this last argument, the Department maintains that it addressed the evidence placed on the record by plaintiffs and discussed each item of evidence in the Remand Results. *See* Remand Results 34–37. In particular, Commerce notes that it reviewed the statement from the Indian Minister of Coal "regarding the price at which coal was supplied to small scale industries

during the POR," and then concluded that "[w]hile the statement explains that 'Small Scale Industry units come in the non-core sector category,' no party has argued that the chemical industry is a small scale industry, nor is there any record evidence to that effect. Accordingly, we find this particular document to be of no consequence regarding the prices at which coal would have been supplied to chemical industry customers during the POR." Remand Results at 36. Thus, for Commerce, whether small-scale industries have access to inexpensive coal is irrelevant because there is no evidence that the Indian chemical industry is a small-scale industry.

As to the Supreme Court of India decision, the Department emphasized that the "Court stated that 'core sector consumers include the vital sections of national economy related to infrastructure development as for example, power, steel, cement, defence, fertilizer, railway, paper, aluminum, export, central public sector undertaking, etc.'" Remand Results at 35. According to Commerce, "the use of 'for example' and 'etc.' suggests that the list is not all inclusive, *i.e.*, it is not necessarily a comprehensive list of all core sector industries." Remand Results at 35. Moreover, the Department insists that even though the decision's "list does not include the chemical industry, as explained elsewhere, other record evidence demonstrates that chemical companies are eligible for the TERI prices," such as Tr Chemicals Pvt., Ltd. and Kanoria Chemical Industries, Ltd. Remand Results at 35.

The Department also addressed "the *Indian Minerals Year Book 2008*, an annual government publication issued by the Indian Bureau of Mines" that was submitted by Jiheng. Remand Results 21. In that publication, the chemical, cement, and fertilizer industries are characterized "as being dependent on coal for their process and energy requirements." Remand Results at 21. As noted, the cement and fertilizer industries are indisputably core industries.

Commerce points out that "[t]he publication lists the chemical industry together with other core industries as coal dependent without discriminating between core and non-core sector industries" and it "refers to dispatches of coal by industry priority" with the "chemical industry . . . identified as a 'priority' industry on . . . par with the cement or steel industries." Remand Results at 21. Furthermore, the "publication discusses coal pricing over the relevant POR and never mentions any distinction in pricing between core and non-core sectors." Remand Results at 21. For these reasons, the Department concluded that "[w]hile the publication does not define industries in terms of core and non-core industries, the designation of the chemical industries as a priority industry (along with the coincidence of the coal prices discussed in the yearbook being similar to the TERI steam coal prices for core industries) supports a finding that the chemical industry is a core industry." Remand Results at 21.

Finally, Commerce reiterated its view that the TERI dataset was the best available information for valuing the steam coal input because the TERI dataset is specific to Jiheng's reported coal inputs. That is, the TERI dataset is for the type of coal actually used by Jiheng. Here, Jiheng provided the Department with information on the useful heat value ("UHV")[10] of the steam coal it used. "Therefore, Jiheng's steam coal inputs are easily categorized using domestic Indian price data, which assigns prices for coal based on UHV." Remand Results at 22; *see also* Remand Results at 37 ("[T]he Department has selected the TERI Data for categories B and C to value steam coal based on Jiheng's reported UHV of between 5300–5900 kcal/kg as provided by Jiheng."). In contrast, "the WTA steam coal price data, which [plaintiffs] suggest [Commerce] use, is listed under the heading 'steam coal,' without further specification of the UHV." Remand Results at 22. Consequently, "because domestic Indian coal data provide the

---

[10]     Coal is classified according to its commercial usefulness as measured by its Useful Heat Value ("UHV").

most product-specific prices, we find that it offers the best available information for valuing Jiheng's steam coal inputs." Remand Results at 22; Def.'s Resp. 11–12 ("The only heat-indexed 'steam coal' surrogate value on the record is the TERI data steam coal value. All other record coal values do not identify the specific type of coal or the heat index of the coal.").

The court finds that Commerce has supported with substantial evidence its determination to value the steam coal input using the TERI data. First, it is clear that Commerce took into consideration the three pieces of evidence plaintiffs placed on the record, and reasonably concluded that they did not present substantial evidence sufficient to undermine Commerce's conclusion that chemical companies in India can qualify for core sector steam coal pricing. That is, the Ministry of Coal annual report, the Indian Supreme Court decision, and the annual report, whether considered separately or in combination, are simply not convincing evidence that the core sector pricing in the TERI data was not available to Jiheng.

The court also finds that it was reasonable for Commerce to conclude that some chemical companies are considered "core sector" industries and can thus benefit from the TERI prices for steam coal. While plaintiffs claim that the "vast majority of chemical companies listed in the [Coal India] customer list are identified as non-core sector customers, not core sector customers," the record evidence does not clearly show that the chemical industry is categorized as a core or a non-core sector, and the Department was able to point to at least one chemical company listed as a core sector industry that was not also listed for some other core activity, such as having a captive power plant. Pls.' Cmts. 9; *see* Def.-Int.'s Resp. 5 ("Commerce pointed to the substantial evidence that India's chemical industry, including those manufacturing product comparable to the subject chlorinated isocyanurates, did, in fact, qualify to receive coal at core prices during the period of review.").

Furthermore, Commerce specifically found "that the TERI data are the best available information with which to value steam coal because they are specific to Jiheng's reported coal inputs, they comport with the core industry pricing, they are complete, and they are contemporaneous with the POR." Remand Results at 22–23. It appears, then, that Commerce has properly examined, explained, and supported its findings with substantial evidence as to the surrogate valuation of the steam coal. *Huaiyin Foreign Trade Corp. V. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (citation omitted)). Therefore, the court finds that here, as has been found in the past, the use of the TERI data is supported by substantial evidence. *See, e.g., Arch Chems.*, 33 CIT at __, Slip Op. 09-00071, at 41 (holding that "Commerce acted reasonably in using the TERI data to value steam coal" because the TERI dataset was the most "product specific" surrogate available); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 1204, Slip Op. No. 05-00126 (2005) (sustaining Commerce's use of TERI data as a surrogate value for coal). Thus, the Department's determination with respect to the surrogate value for steam coal is sustained.

## IV.     Commerce's Valuation of the Ammonia Gas By-Product Credit

In the Final Results, the Department granted Jiheng a by-product offset for ammonia gas, which the Department valued using Indian import data for anhydrous ammonia[11] from the WTA. Because the Department believed it had not adequately explained why the value for anhydrous

---

[11]     According to defendant-intervenor, "there are only two forms of ammonia gas—anhydrous and hydrous (as opposed to ammonia compounds that are not at issue here). The terms 'anhydrous' and 'hydrous' refer to whether or not the ammonia gas molecules are combined with water. Specifically 'anhydrous' means 'Being without water, especially water of hydration.'" Def.-Int.'s Resp. 6 (quoting MCGRAW-HILL DICTIONARY OF SCIENTIFIC & TECHNICAL TERMS 103 (6th ed. 2003)).

ammonia was appropriate for valuing the by-product offset credit, it requested a voluntary remand to further explain its reasoning. Remand Results at 23. In *Clearon II*, the court granted Commerce's request and directed the Department to "explain its selection of anhydrous ammonia to value the ammonia gas by-product offset." *Clearon II*, 35 CIT at __, Slip Op. 11-142 at 31.

On remand, Commerce states that "the Department grants an offset to normal value for scrap generated during the production of subject merchandise if the respondent can demonstrate that the scrap by-product is either resold, or has commercial value and reenters the respondent's production process." Remand Results at 23. Furthermore, "in valuing by-product offsets, . . . the Department uses surrogate values based on the best available record information, as it does for other [factors of production]." Remand Results at 23. Here, the Department has again concluded that the WTA Indian import data for anhydrous ammonia is the best available information for valuing the ammonia gas by-product. Remand Results at 24.

Plaintiffs argue that Commerce's determination is flawed because Jiheng's ammonia gas by-product is not actually anhydrous ammonia. Thus, according to plaintiffs, the ammonia gas was improperly valued. In addition, plaintiffs believe that the Department should deny a by-product offset altogether based on (1) its previously-stated argument that Jiheng does not actually produce pure ammonia gas, but rather it produces a waste ammonia gas, and the anhydrous ammonia used to value this waste gas has a minimum purity level of 99%; and (2) because Jiheng does not possess the processing and packaging facilities that would be required to convert its waste ammonia gas by-product into the type of pure ammonia gas that would be more equivalent to the anhydrous ammonia used to value the waste ammonia gas by-product. Pls.' Cmts. 13. At center, plaintiffs argue that "the fundamental error . . . is that the Department is

crediting the respondent for the value of a highly-processed, high value-added product that it does not produce." Pls.' Cmts. 13.

For its part, the Department disagrees with plaintiffs' "speculative argument that Jiheng did not produce pure ammonia gas. Record evidence indicates that Jiheng indeed produced pure ammonia gas that was used in the production of the downstream product of ammonium sulfate." Remand Results at 38. Commerce further points out that "in valuing Jiheng's ammonia gas by-product, the Department did not actually value the total quantity of ammonia gas that Jiheng produced during production of the subject merchandise because Jiheng was unable to place a measuring instrument to track the amount of pure ammonia gas produced or consumed." Remand Results at 24. "Upon the Department's request, however, Jiheng provided evidence that limited the quantity of ammonia claimed as a by-product offset to the amount of 100-percent pure ammonia gas—created from its production of subject merchandise—that was consumed in producing the amount of ammonium sulfate [the downstream product] that was actually sold [by Jiheng] during the POR." Remand Results at 24–25.

In other words, Jiheng informed the Department of the actual quantity of pure ammonia gas that was needed to produce the ammonium sulfate that it produced and sold during the POR. Thus, "while the total weight of the ammonia gas that was generated during Jiheng's production may include non-ammonia by-products . . . , the quantity of ammonia gas that is being valued [for purposes of the offset] is a pure chemical weight, and we are only granting Jiheng a by-product offset for the pure ammonia content within the ammonium sulfate that it produces from its ammonia gas." Remand Results at 25; *see also* Remand Results at 38–39 ("Jiheng also provided information to demonstrate that the quantity of ammonia for which the Department applied an offset was limited to the amount created from Jiheng's reported [factors of

production], and limited further by the amount that was used to produce ammonium sulfate that was actually sold during the POR.").

Second, "the record contains no evidence that Jiheng purchased ammonia gas in addition to the ammonia gas that Jiheng produced that could have entered into its production of ammonium sulfate." Remand Results at 38; *see also* Remand Results at 39 ("[T]here is no evidence on the record to demonstrate that the ammonia gas used by Jiheng to produce ammonium sulfate was not obtained from the ammonia gas produced as a result of the production of its subject merchandise."). Therefore, the Department concluded that the ammonia gas required for its production of its downstream product, the ammonium sulfate, was produced as a by-product of its production of isos, and then repurposed in the ammonium sulfate production process.

Thus, the Department insists that substantial evidence supports its granting of a by-product credit because: (1) it is undisputed that Jiheng produces ammonium sulfate; (2) pure ammonia gas is required to make ammonium sulfate; (3) there is no evidence Jiheng purchased pure ammonia gas, and, thus, the by-product is the only possible source; and (4) since Jiheng did not sell any pure ammonia gas, the by-product credit was limited to the amount required to make the ammonium sulfate Jiheng actually produced.

As to the valuation of the by-product credit, the Department observed that plaintiffs did not place on the record an alternative value for Jiheng's by-product. Remand Results at 26 ("[T]he WTA data for anhydrous ammonia is the only surrogate value information for ammonia available on the record of this administrative review."). Furthermore, "the surrogate product, *i.e.*, anhydrous ammonia is very similar to the 100-percent ammonia gas for which the Department is granting the by-product offset." Remand Results at 25

Having revisited its determination to use anhydrous ammonia to value the ammonia gas by-product offset, Commerce has reconsidered and fully explained its decision. It is undisputed that Jiheng produces ammonium sulfate. It is equally undisputed that Jiheng did not purchase the pure ammonia gas required to produce the ammonium sulfate that Jiheng actually produced and sold during the POR. Therefore, it was reasonable for Commerce to conclude that Jiheng reused the waste ammonia gas from the production of isos as an input in the production of ammonium sulfate, as there is no indication of any other potential source of the required ammonia gas. Hence, Commerce's conclusion that Jiheng was entitled to a by-product credit for its repurposing of the waste ammonia gas in the ammonium sulfate's manufacture was reasonable. It was also reasonable for Commerce to use the only value on the record to calculate the offset, and to apply the offset to the amount of ammonia gas actually used to produce ammonium sulfate.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results of Redetermination are SUSTAINED.

/s/ Richard K. Eaton
Richard K. Eaton

Dated: February 20, 2013
     New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

CLEARON CORPORATION and
OCCIDENTAL CHEMICAL
CORPORATION,

      Plaintiffs,

        v.

UNITED STATES,

      Defendant,

      and

ARCH CHEMICALS, INC.,

      Defendant-Intervenor.

Before: Richard K. Eaton, Judge

Court No. 08-00364

## JUDGMENT

Upon consideration of the papers and proceedings had herein, and in conformity with the court's decision in this matter, it is hereby

ORDERED that the Remand Results are sustained. Accordingly, this case is dismissed.

                                  /s/ Richard K. Eaton
                                   Richard K. Eaton

Dated: February 20, 2013
      New York, New York